UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE MGT CAPITAL INVESTMENTS, INC. SECURITIES LITIGATION | No. 1:16-cv-07415 (NRB)<br>CLASS ACTION<br>JURY TRIAL DEMANDED<br>This Document Relates To: All Actions |

# AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Danny T. Nguyen and Song Suh, on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by Lead Counsel, which included a review of, *inter alia*, SEC filings by MGT Capital Investments, Inc. ("MGT" or the "Company"), press releases and other public statements by Defendants, media and analyst reports and advisories about Defendants and the Company, interviews with confidential witnesses, and other public information. Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired MGT securities between May 9, 2016 and October 19, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Before and during the Class Period, MGT was not in compliance with Sections 1002(c) and 1003(c) of the NYSE MKT Company Guide, which govern a security's eligibility for continuing to be listed on the NYSE MKT (the "Exchange"). Accordingly, MGT's stock was in danger of being delisted. Specifically, these regulations call for a company's stock to be delisted if the company had ceased to be an "operating company," in that the company had "substantially discontinued the business that it conducted at the time it was listed or admitted to trading" and had "become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical."

3. In 2015, MGT had basically jettisoned its previous business operations in online gaming and essentially ceased to be a viable ongoing entity. Then in May 2016, it suddenly announced that it was transforming itself into a cybersecurity company named John McAfee Global Technologies, Inc. and that Defendant John McAfee would be the Company's Executive Chairman and CEO. As part of this transformation, MGT had entered into two major acquisition agreements: an agreement announced on May 9, 2016 to acquire certain assets and technology from D-Vasive Inc., a provider of anti-spy software (the "D-Vasive Transaction"), and another agreement announced on May 26, 2016 to acquire assets and technology from Demonsaw LLC, a "provider of a secure and anonymous file sharing software platform" (the "Demonsaw Transaction").

4. MGT had had no previous involvement or experience in cybersecurity, and Defendants themselves admitted that the new cybersecurity venture was not at a commercially viable stage. This put MGT squarely in noncompliance with the continued listing requirements. During the Class Period, Defendants affirmatively and repeatedly discussed steps that MGT was taking to ensure that it was in compliance with the listing requirements, but such statements

failed to mention the true risks of being delisted due to the Company's ongoing violation of Section 1003(c)'s requirement that a listed company remain an "operating company." As Defendants themselves raised the delisting issue in SEC filings, they had a duty to speak truthfully and completely about it – but Defendants misrepresented the true risks of delisting as the statements failed to disclose most serious delisting risk concerning MGT's failure to meet the "operating company" standard.

5. Both of these transactions (which concerned new business ventures for MGT) required shareholder authorization as well as the Exchange's approval for the listing of 43.8 million new MGT shares. Because Defendants needed to apply to the Exchange for approval to list these shares, this application to the Exchange only magnified the risk that the Exchange would review MGT's operations more generally and realize it was no longer an operating company.

6. These exact risks materialized. On September 9, 2016, MGT announced that its stockholders had approved the issuance of a total of 43.8 million shares of common stock necessary to effectuate the D-Vasive Transaction and Demonsaw Transaction. But on September 19, 2016, the NYSE informed MGT that it would "not approve the listing on the Exchange of the 43.8 million shares that the Company is required to issue in order to complete the closing of the D-Vassive [sic] merger." On this news, MGT stock fell $0.63, or 25%, to close at $1.89 on September 20, 2016.

7. At the end of the day on October 19, 2016, the Exchange informed MGT that it was moving to delist MGT's stock, forcing it to trade over the counter. On October 21, 2016, MGT's stock closed at $1.29, down 45% from its close of $2.35 on October 19, 2016.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

10. This Court has subject matter jurisdiction under 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11. Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant MGT was headquartered within this District at all relevant times until November 2016, when its headquarters moved to Durham, NC.

12. In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

13. Lead Plaintiffs Danny T. Nguyen and Song Suh purchased MGT securities at artificially inflated prices during the Class Period and were damaged thereby.

14. Defendant MGT, originally incorporated in Utah in 1977, was reincorporated in Delaware in 2000 under the name "HTTP Technology, Inc." It changed its name to Medicsight, Inc. in 2002 and then to MGT Capital Investments, Inc. in 2007. Until November 2016, MGT's principal executive offices were located at 500 Mamaroneck Avenue, Suite 204, Harrison, New York 10528. Since November 2016, MGT's principal executive offices have been located at 512

S. Magnum Street, Suite 408, Durham, North Carolina 27701. At all relevant times until October 20, 2016, MGT's common stock traded on the NYSE MKT LLC under the ticker symbol "MGT." Since October 20, 2016, MGT's common stock has traded on the OTC Pink tier of OTC Markets LLC under the symbol "MGTI."

15. Defendant Robert B. Ladd is currently President and interim Chief Financial Officer of MGT, as well as a director. Ladd joined the Company in December 2010 as a director. He was appointed Interim President and CEO in February 2011, President and CEO in January 2012, and Interim Treasurer and Interim Chief Financial Officer in December 2015. He served as CEO until November 18, 2016.

16. Defendant John McAfee is currently CEO and Executive Chairman of the Board of MGT; he has officially served in that role since November 18, 2016. On May 9, 2016, the Company announced that McAfee was to be named the Company's next Executive Chairman and CEO and that MGT was to be renamed "John McAfee Global Technologies, Inc." As of May 22, 2017, the Company is involved in a dispute with Intel over the ownership and permitted usage of the name McAfee.

17. Defendants Ladd and McAfee are referred to herein as the "Individual Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **MGT**

18. The Company's stock went public in 2000. Since then, the Company has struggled to find its footing, and its business strategy and self-description have changed radically numerous times.

19. In 2000, the Company was named HTTP Technology, Inc. and focused on "strategic acquisitions in Internet and Internet-related businesses." In 2002, it became Medicsight, Inc., focusing on medical imaging technology. In 2007, it became MGT Capital Investments, Inc., a holding company focused on health-care information technology.

20. However, the Company has reported losses every single year since at least 2001. As a result, the "Company's primary source of operating funds since inception has been debt and equity financings."[1] The Company's aggressive use of equity financing, and its inability to produce a profit in any of the industries it has attempted to enter, inevitably resulted in repeated stock price devaluations. As recently as 2007, its stock was trading for $120; by 2011, MGT's stock price had fallen below $1.

21. In 2011 and 2012, the Company received notices from the Exchange that it was not in compliance with Exchange rules and therefore risked being delisted. In response to these notices, MGT worked with the Exchange to cure the deficiencies and ultimately had to effectuate a reverse stock split in March 2012.

22. Meanwhile, in July 2011, the CEO of Medicsight (which specialized in computer-aided detection of health problems), MGT's most important subsidiary at the time, was forced to resign due to improprieties concerning undisclosed related-party transactions.

23. So, around 2012, Defendant Ladd started taking the Company in a new direction. Ladd had joined MGT in 2010 as a director and was appointed Interim President and CEO in February 2011 and President and CEO in January 2012. Under Ladd's direction, MGT began acquiring intellectual property for online gaming platforms. Beginning in 2013 and up to as late

[1] MGT Capital Investments, Inc., Annual Report for the Year Ended December 31, 2015 (Form 10-K) (Apr. 14, 2016) (the "2015 10-K").

as April 2016, the Company described itself primarily as "engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry."[2]

24. But this still failed to turn the Company around. In the years 2011 through 2013, the Company's net losses went from $4.55 million in 2011, to $3.6 million in 2012, to $10.2 million in 2013. Even worse, its revenues also kept declining every year: $536,000 in 2011, then $409,000 in 2012, and then $396,000 in 2013.

25. The one venture with any promise was DraftDay.com, a fantasy sport business and software platform that MGT acquired in April 2014 for $600,000 in cash and 100,000 shares of common stock. In December 2014, Robert Traversa, MGT's then-CFO, called DraftDay "our crown jewel in our portfolio of assets."[3]

26. DraftDay generated meaningful revenue: gross margin of $353,000 in 2014 on revenue of $963,000, and gross margin of $415,000 in 2015 on revenue of $640,000. Operating expenses remained high, and so DraftDay overall generated a net loss of $1.6 million in 2014 and $1.1 million in 2015. Nevertheless, for a time, DraftDay led to a significant improvement in MGT's financials: MGT's 2014 revenues were $1.05 million, far higher than 2013's $396,000. MGT's 2014 10-K explicitly stated that the "increase in revenues is attributed to DraftDay, acquired in the second quarter of 2014."

27. But MGT was constantly low on cash and its operating expenses remained high. As of March 31, 2015, MGT had only $1.4 million in cash, but its net loss in the previous quarter

---

[2] For example, MGT used this language in its Annual Reports on Form 10-K for 2013, 2014, and 2015.

[3] Leslie Stone, Interview with Robert Traversa, *Opportunist Magazine*, Dec. 23, 2014, available at http://content.stockpr.com/mgtci/files/Opportunist_Fantasy-sports.pdf.

had been $1.29 million. As of June 30, 2015, it had $1.1 million in cash, and its net loss in the previous quarter had been $851,000. On August 14, 2015, in its Quarterly Report on Form 10-Q for the second quarter of 2015, MGT had to disclose "substantial doubt about the Company's ability to continue as a going concern." As a result of these losses, MGT desperately needed capital.

28. Meanwhile, MGT's stock price continued to drop, making it increasingly difficult to raise funds through equity financing. Although MGT's stock price was $2.91 at the beginning of 2014, it had fallen below $2 by April and was down to $0.63 by the end of the year. From October 2014 until the end of 2015, it never went above $1; in the second half of 2015, it never closed higher than $0.43.

29. As an April 27, 2015 *Seeking Alpha* article[4] explained, this "pending liquidity crisis" forced MGT to sell DraftDay, its most valuable asset (emphases added):

> Previously, there were other hopes for the company's ventures, but these disappointed. **The key is now DraftDay**, which is a very interesting property and the 3rd largest fantasy sports portal.
>
> ***
>
> **More problematic is its pending liquidity crisis**. The company has SG&A of between $6 and $7 million per year and only $1.5 million in cash left. Growth is amazing, margins are excellent, and there is a ton of operating leverage, but **somewhere in the next few quarters, the company will be facing empty coffers**. To invest here, you need confidence the company will manage its liquidity crunch and either get capital into the company at decent terms or sell it for a good price.

---

[4] Bram de Haas, *MGT Capital Investments: DraftDay Is An Interesting Asset And The Company Is A Willing Seller*, Seeking Alpha, Apr. 27, 2015 8:32 PM ET, https://seekingalpha.com/article/3107546-mgt-capital-investments-draftday-is-an-interesting-asset-and-the-company-is-a-willing-seller.

30. MGT sold DraftDay in September 2015 for approximately $5.5 million. As the Company noted in its September 9, 2015 press release announcing the sale, a major benefit of the sale was that it "materially reduces the Company's ongoing burn rate." But the sale of DraftDay also forced MGT to record a $387,000 "loss on sale of assets" in its 2015 10-K, and the Company's net cash flow remained negative. As a result, MGT began desperately searching for new sources of operating capital.

31. MGT looked to the equity markets for operating capital. On October 8, 2015, MGT raised $700,000 by entering into subscription agreements with a group of accredited investors led by Barry Honig in exchange for 2.8 million shares of MGT common stock and options to buy 5.6 million additional shares. This provided MGT with enough cash to survive a few more months, but it also led to significant stock dilution, as MGT went from 14 million shares outstanding in September 2015 to 23.8 million shares outstanding in May 2016.

32. More importantly, the Company still lacked any discernible business plan for addressing its chronic liquidity problems. In the October 9, 2015 press release announcing the capital raise, Ladd had only this to say to investors: "With MGT's further enhanced balance sheet and reduced cost structure, I believe the time is perfect to consider all methods to create value for shareholders."

33. By the end of 2015, according to the 2015 10-K, the Company had only $398,000 in "cash, cash equivalents, and restricted cash"; a stock price of $0.23; and an accumulated deficit in shareholders' equity of $303,944,000. It had slashed headcount and expenses to the point of having *only two* full-time employees.[5] Yet its negative cash flows from operations for

[5] MGT had even let its CFO's employment expire, which meant Defendant Ladd had to serve as interim CFO as well as CEO, which caused obvious significant deficiencies in the Company's

the year were still $2.4 million. And it had generated only $104,000 in revenue from continuing operations in the year—$102,000 of which was "primarily related to the non-recurring gaming patent licensing fee."[6]

34. As MGT's auditor Friedman LLP noted in the 2015 10-K, all of this, particularly the fact that MGT "had incurred significant operating losses since inception and continues to generate losses from operations," raised "**substantial doubt about the Company's ability to continue as a going concern**."

35. And yet, the Company had virtually nothing to tell investors about its plan to address this problem. In its 2015 10-K, the Company's clearest statement of its corporate strategy was: "Following the sale of DraftDay.com, the Company has been considering all methods to create value for shareholders, including potential mergers, spin–offs, distributions and other strategic actions."

36. Into this void stepped John McAfee.

## John McAfee

37. John McAfee is a computer programmer and political activist who has been described as "a folk hero in hacker circles"[7] and an "eccentric cybersecurity legend."[8] He

---

internal control over financial reporting including "insufficient independent review of duties performed."

[6] MGT had recognized $640,000 in revenue from DraftDay in 2015, but this was not included in the Company's top-line revenue figures because DraftDay was a discontinued operation.

[7] Thomas Fox-Brewster, *What Do You Get When You Cross John McAfee And GTA V? 'Magic' Encryption, Apparently*, Forbes, Aug 20, 2015 8:01 AM, https://www.forbes.com/sites/thomasbrewster/2015/08/20/eijah-john-mcafee-and-demonsaw/#70d0efd41cec.

[8] Cale Guthrie Weissman, *The insane life of former fugitive and eccentric cybersecurity legend John McAfee*, Business Insider, Jul. 23, 2015 12:12 PM, http://www.businessinsider.com/the-insane-life-of-john-mcafee-2015-7.

founded the software company McAfee Associates in 1987 and created the first commercial antivirus software, which still retains his brand name. He resigned from his company in 1994 and sold his shares in 1997.

38. McAfee's wealth peaked in 2007 at $100 million, but his fortune was ruined in the global financial crisis. He then moved to Belize, where, according to the 2016 Showtime Documentary "Gringo: The Dangerous Life of John McAfee," he "built a heavily armed compound in the jungle, like a modern day Heart of Darkness."[9] After returning to the US in 2013, he started focusing heavily on cybersecurity.

39. In November 2013, he created a startup incubator called Future Tense Central (later Future Tense Secure Systems, Inc.) ("Future Tense"). According to a *USA Today* article, Future Tense was "a converted 150,000-square-foot railroad station" where "McAfee oversees and mentors about 10 start-ups while developing his own security products."[10] Kyle Sandler, a longtime Google employee, ran Future Tense day-to-day. Tom Guscinski served as Future Tense's COO and President. McAfee's wife, Janice Dyson, owned 33% of Future Tense and was its sole director.

40. In October 2014, Future Tense entered into a contract with newly-incorporated D-Vasive Inc., which had been created by Louis Franco III and John Thomas Clore earlier that year. Under the deal, Future Tense acquired 30% of D-Vasive in exchange for a promise to market D-Vasive's products. At the time, D-Vasive's main product was an Android app that

---

[9] IMDB.com listing for "Gringo: The Dangerous Life of John McAfee", http://www.imdb.com/title/tt6071534/plotsummary?ref_=tt_ov_pl.

[10] Jon Swartz, *John McAfee prepares for his last stand'*, USA Today, Feb. 10, 2015 4:43 p.m. ET, https://www.usatoday.com/story/tech/2015/02/10/john-mcafee-tennessee-security-legend-futuretense-alabama/21712017/.

notified users if a third-party application was attempting to access the phone's camera, microphone, Bluetooth, or Wi–Fi.

41. By August 2015, Future Tense was also supporting Demonsaw, an encrypted "social crypto" file sharing platform developed by computer programmer Eric J. Anderson, also known as Eijah. McAfee described Demonsaw as "the smartest thing since sliced bread" and said he expected it to "change the entire fabric of social communications."[11] McAfee sponsored a party for Demonsaw at the hacker conference DefCon in August 2015, and he provided Anderson with "an office and application developers, but 'no direct cash.'" But Anderson wanted to develop Demonsaw into a commercially viable product, so he needed cash.

**The D-Vasive Transaction and MGT's Purported Transformation into John McAfee Global Technologies, Inc.**

42. McAfee first heard of MGT in March 2016.[12] In April 2016, McAfee was introduced by Ladd by John O'Rourke, the managing member of ATG Capital LLC. ATG Capital LLC was one of several accredited investors (led by an investor named Barry Honig) who had entered agreements with MGT on October 8, 2015 that together provided MGT with $700,000 of equity capital.

43. A complaint filed by ATG Capital LLC against MGT provided the following account of McAfee's meeting with Ladd and O'Rourke:

> O'Rourke and Ladd agreed that McAfee would be a valuable addition to MGT management and his assets could help MGT develop into a leading cybersecurity firm. In April 2016, O'Rourke, Ladd, McAfee, and other MGT and McAfee advisors met at the New York office of MGT's

[11] Seth Rosenblatt, *Founder of Demonsaw explains why we need it*, Parallax, Oct. 13, 2015, https://www.the-parallax.com/2015/10/13/founder-of-demonsaw-explains-why-we-need-it/.

[12] John McAfee (@officialmcafee), Twitter (May 18, 2016, 3:41 am), https://twitter.com/officialmcafee/status/732838400621940736 .

> corporate counsel, where the parties agreed that MGT would be rebranded as a cybersecurity company led by McAfee.
>
> ***
>
> The parties agreed at that meeting that MGT could start by acquiring one of Future Tense's more promising portfolio companies as a platform. McAfee would join MGT as Chairman and CEO to build out a leading cybersecurity company….
>
> Ladd and McAfee were enthusiastic about the opportunity that had been presented by Plaintiffs, and the parties agreed that, upon McAfee's appointment as MGT's Chairman and CEO, MGT would begin its transformation into a cybersecurity firm by acquiring certain assets and technology known as D-Vasive, an anti-spyware technology being developed for mobile devices. Future Tense owned the D-Vasive app and technologies. McAfee and Ladd orchestrated the spin out of D-Vasive from Future Tense through the formation of a new company, D-Vasive, Inc. ("D-Vasive"), which would then enter into binding agreements to be acquired by MGT.[13]

44. The problem was that MGT had very little cash. According to MGT's Quarterly Report on Form 10-Q for the first quarter of 2016, as of March 31, 2016, it had only $189,000. And its cash situation was not improving: according to MGT's Quarterly Report on Form 10-Q for the second quarter of 2016, MGT ultimately had zero revenue in the first six months of 2016, as well as a net loss of $7.4 million.

45. So, to finance the deal, on May 5, 2016, D-Vasive "issued to accredited investors a total of $100,000 principal amount of six–month 6% Convertible Notes" that could be "converted into 8,800,000 shares of D–Vasive common stock"[14] (the "D-Vasive Notes"). According to ATG Capital LLC, the D-Vasive Notes were issued to the same investors who had

---

[13] Am. Complaint ¶¶ 17–19, *ATG Capital LLC et. al. v. MGT Capital Investments, Inc.,* No. 17-cv-2240-AJN (S.D.N.Y. Jun. 26, 2017), ECF No. 54.

[14] MGT Capital Investments, Inc., Definitive Proxy Statement (Schedule 14A) (Aug. 15, 2016), Annex F at F-13.

provided MGT with $700,000 of equity capital in October 2015, and they provided "a bridge loan of $100,000 for D-Vasive to support management salaries, fees, and costs of operations while MGT obtained shareholder approval."[15]

46. MGT announced the D-Vasive deal publicly in a pre-market May 9, 2016 press release and 8-K, stating in relevant part (emphasis added):

> **John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology**
>
> *Mr. McAfee to be Chairman and CEO of renamed John McAfee Global Technologies*
>
> MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that it has entered into a definitive asset purchase agreement to acquire certain technology and assets from D-Vasive Inc., a provider of leading edge anti-spy software. D-Vasive offers a powerful tool for protection from the proliferation of invasive apps by consumer products companies, social networks, financial institutions and others. These invasive apps can secretly turn on a phone's microphone and camera, as well as monitor geographic movements and access contacts. The D-Vasive technology operates in a unique way, allowing the user to manage and control the device's internal hardware. D-Vasive will be available shortly for Android and Windows platforms, followed by a release for Apple iOS.
>
> In conjunction with the acquisition, MGT is pleased to announce the proposed appointment of John McAfee as Executive Chairman and Chief Executive Officer. Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion, and is actively involved in the development of new measures to protect individual freedoms and privacy. Mr. McAfee stated, "The enormous impact of cybersecurity on our lives requires the scale and resources of a public company. Our ability to continue to hire the best minds in the business will be vastly enhanced with a public platform. **With the acquisition of D-Vasive technology as a starting point, we expect to grow MGT into**

---

[15] Am. Complaint ¶ 20, *ATG Capital LLC et. al. v. MGT Capital Investments, Inc.,* No. 17-cv-2240-AJN (S.D.N.Y. Jun. 26, 2017), ECF No. 54.

> **a successful and major force in the space."** MGT Capital also intends to change its corporate name to John McAfee Global Technologies, Inc.

47. Under the terms of the deal, D-Vasive stockholders would receive $300,000 in cash and 23.8 million restricted shares of MGT stock. Given how little cash MGT had at the time, the deal required MGT to essentially bankrupt itself to pay $300,000 and then make up the difference by issuing new shares that were "expected to amount to roughly 47% of the Company."

48. The deal gave McAfee significant incentives to pump up MGT's stock price. First, under the proposed agreement for McAfee's employment as MGT's Executive Chairman and CEO, he would receive options to purchase (i) 1 million shares at the higher of $0.25 and the current MGT share price; (ii) 2 million shares at $0.50; and (iii) 3 million shares at $1.00.[16] These options would vest in twenty-four equal monthly installments, which meant that every month, McAfee would receive options to purchase over 41,000 shares at market price, over 83,000 shares at $0.50, and 125,000 shares at $1.00. McAfee's proposed share compensation plan was so generous that it, together with Ladd's, exceeded MGT's previously-approved 2012 Stock Incentive Plan, which meant that the Company had to ask shareholders to approve a new 2016 Stock Option Plan.

49. Second, McAfee had a significant stake in Future Tense because his wife Janice Dyson owned of 33% of it—which MGT did not disclose to investors until August 8, 2016 in response to an SEC Comment Letter. And under the D-Vasive Transaction, Future Tense would

[16] MGT Capital Investments, Inc., Definitive Proxy Statement (Schedule 14A) (Aug. 15, 2016) at 40.

receive 12 million MGT shares[17] and would also enter a consulting agreement with MGT under which Future Tense would receive $250,000, plus a $250,000 cash bonus if MGT's stock price exceeded $1 for ten consecutive days, plus an *additional* $350,000 if MGT's stock price exceeded $2 for ten consecutive days.

50. McAfee wasted no time before touting the Company's new business plan and his commitment to the new role, posting a flurry of tweets and Facebook posts promoting his "new company." MGT also issued a press release on May 16, 2016 titled "Cybersecurity Pioneer John McAfee Renews his Commitment to the Technology Space that he Practically Created 30 Years ago with the McAfee Anti-Virus Software." Meanwhile, professional stock promoter StockBeast launched a $125,000 promotional campaign on MGT stock from May 9 until July 5.

51. Over the next few days, MGT's stock price skyrocketed at unprecedented trading volume. On May 6, 2016, it had closed at $0.36. Over the next few days, here are MGT's daily closing prices:

a. $0.48 on May 9, 2016—a 33% increase over the previous day;

b. $0.73 on May 10, 2016—a 52% increase over the previous day;

c. $1.28 on May 11, 2016—a 75% increase over the previous day;

d. $1.51 on May 12, 2016—an 18% increase over the previous day;

e. $1.72 on May 13, 2016—an 14% increase over the previous day;

f. $2.96 on May 16, 2016—a 72% increase over the previous day;

g. $4.15 on May 17, 2016—a 40% increase over the previous day.

[17] In addition, D-Vasive co-founders Louis Franco III and John Thomas Clore would each receive 1.5 million, and the holders of the D-Vasive Notes would receive 8.8 million, totaling 23.8 million.

52. In the words of a May 18, 2016 *Bloomberg* article, MGT was "an obscure penny stock that has surged sevenfold in two weeks…. Volume has jumped sixfold and the market value surged to about $80 million from $6 million—for a company that has reported losses every year since at least 2001."[18]

53. However, the statements in MGT's May 9, 2016 press release and Form 8-K referenced above (which was signed by Defendant Ladd) were materially false and misleading because they failed to disclose the following adverse facts, which Defendants either knew or recklessly disregarded:

a. The press release quoted McAfee as saying "With the acquisition of D-Vasive technology as a starting point, we expect to grow MGT into a successful and major force in the space." Defendants had no basis in fact to make this statement. As explained more fully below at ¶¶ 71-81, Defendants knew or should have known that the Exchange was unlikely to list the shares needed to consummate the transaction.

b. Defendants failed to disclose that, for the reasons detailed below at ¶¶ 71-81, MGT's request to the Exchange for listing additional shares was likely to cause the Exchange to (1) closely scrutinize MGT, (2) discover that MGT was not in compliance with the Exchange's continued listing requirements, and (3) delist MGT.

**The Demonsaw Acquisition**

54. Next, MGT announced a deal to acquire Demonsaw.

55. On May 12, 2016, MGT had announced it had paid $150,000 to acquire an interest in Round House LLC, an Alabama-based technology incubator. Round House's

---

[18] Joseph Ciolli, *McAfee Microcap's Down Day Does Little to Dent 2-Week Frenzy*, Bloomberg, May 18 2016 3:29 pm, https://www.bloombergquint.com/markets/2016/05/18/mcafee-microcap-s-down-day-does-little-to-dent-two-week-frenzy .

managing member was Kyle Sandler, who owned an interest in Demonsaw and had previously worked on McAfee's presidential campaign and run Future Tense's day-to-day operations.

56. On May 26, 2016, pre-market, MGT announced the Demonsaw acquisition in a press release and Form 8-K, stating in relevant part (emphasis added):

> **MGT Capital Agrees to Acquire Secure File Sharing Technology**
>
> *Eric Anderson to be appointed as Chief Technology Officer of to-be-renamed John McAfee Global Technologies*
>
> MGT Capital Investments, Inc . (NYSE MKT: MGT) announced today that it has entered into a definitive asset purchase agreement to acquire certain technology and assets from Demonsaw LLC , a provider of a secure and anonymous file sharing software platform. Using multiple layers of encryption (both symmetric and asymmetric), Demonsaw offers users full control of data and also offers private router services. Demonsaw is a fully decentralized, mesh-based network that does not use P2P, providing protection of IP addresses….
>
> In conjunction with the anticipated acquisition, MGT is pleased to announce the proposed appointment of Eric J. Anderson as Chief Technology Officer upon closing of the transaction. Mr. Anderson, who is well known as "Eijah" in the hacker community, is the founder of Demonsaw. For the past five years he was an Associate Technical Director and Lead Programmer for Rockstar Games where he architected core engine and artificial intelligence code for Grand Theft Auto, among the world's highest grossing video game franchises….He is an active member of the hacking community and is an avid proponent of Internet freedom.
>
> Closing of the acquisition is contingent on customary conditions including approval by MGT's stockholders. Major terms of the deal include the payment to Demonsaw LLC members of 20.0 million restricted shares of MGT common stock. The proposed share issuance is expected to amount to approximately 28% of the Company's common stock on a pro-forma fully diluted basis at closing, inclusive of shares of common stock to be issued in connection with the Company's previously announced transaction with D-Vasive, Inc.
>
> ***

> Mr. McAfee, concluded with this comment, "I want to reiterate my personal commitment towards the creation of a major force in cybersecurity. **As a listed company with proper corporate governance and regulatory standards, MGT will be the vehicle I use to create wealth for all stockholders."**

57. Under the terms of the deal, Demonsaw members would receive 20 million restricted shares of MGT common stock. This required MGT to issue new shares that were "expected to amount to approximately 28% of the Company's common stock on a pro-forma fully diluted basis at closing, inclusive of shares of common stock to be issued in connection with the Company's previously announced transaction with D-Vasive, Inc."

58. The Demonsaw Transaction was financed in part through "certain convertible debt securities issued by Demonsaw on or about May 25, 2016."[19] According to ATG Capital LLC, these securities consisted of a "bridge loan…of $750,000 in the form of eight convertible promissory notes" that were "convertible into 10 million shares of Demonsaw" and subject to "mandatory conversion…into equity upon Demonsaw's acquisition by MGT."[20]

59. On news of the Demonsaw Transaction, MGT's share price climbed $0.07, or 3.12%, to close at $2.31 on May 26, 2016.

60. However, the statements in MGT's May 26, 2016 press release and Form 8-K referenced above (which was signed by Defendant Ladd ) were materially false and misleading because they failed to disclose the following adverse facts, which Defendants either knew or recklessly disregarded:

a. Defendants failed to reveal that the Demonsaw Transaction was unlikely to close under the terms of the Demonsaw Asset Purchase Agreement because, for the

---

[19] *See* MGT Capital Investments, Inc., Current Report (Form 8-K) (Mar. 3, 2017), Ex. 10.1, at 8.

[20] Am. Complaint ¶¶ 26–27, *ATG Capital LLC et. al. v. MGT Capital Investments, Inc.,* No. 17-cv-2240-AJN (S.D.N.Y. Jun. 26, 2017), ECF No. 54.

reasons detailed below at ¶¶ 71-81, Defendants knew or should have known that the Exchange was unlikely to list the shares needed to consummate the transaction;

b. Defendants failed to disclose that, for the reasons detailed below at ¶¶ 71-81, MGT's request to the Exchange for listing additional shares was likely to cause the Exchange to (1) closely scrutinize MGT, (2) discover that MGT was not in compliance with the Exchange's continued listing requirements, and (3) delist MGT.

c. Defendants misrepresented MGT as a "listed company with proper corporate governance and regulatory standards," even though Defendants knew or should have known that MGT was in direct non-compliance with NYSE listing regulations, which would cause the NYSE to delist MGT.

**Throughout the Class Period, MGT Concealed That It Was Not An "Operating Company" As Required By The NYSE And Was Thus In Danger Of Being Delisted**

61. Throughout the Class Period, MGT no longer qualified as an "operating company" under NYSE MKT listing requirements, and its stock was therefore in danger of being delisted.

62. Under Section 1002(c) of the NYSE MKT Company Guide, the NYSE will "consider the suspension of trading in, or removal from listing or unlisted trading of, any security when, in the opinion of the Exchange…the issuer has…ceased to be an operating company." Under section 1003(c), a company ceases to be an "operating company" when "the issuer has substantially discontinued the business that it conducted at the time it was listed or admitted to trading, and has become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical."

63. Under this standard, MGT had ceased to be an "operating company" by no later than September 2015, when MGT sold the majority of its interest in DraftDay. Accordingly,

Defendants knew or should have known that they were in violation of Section 1003(c), and were likely to be delisted.

64. First, Defendants knew or should have known that MGT had "substantially discontinued the business that it conducted at the time it was listed or admitted to trading."

65. Before May 2016, MGT never had any holdings or other activity in the cybersecurity space; since at least 2013, it had described itself primarily as "engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space as well as the social casino industry."[21] But in September 2015, MGT had to sell all but 11% of its stake in DraftDay, its only promising venture in years, simply because MGT was running out of cash. In fact, MGT admitted in its 2015 10-K that its business related to online and mobile gaming and that the 2015 sale of DraftDay.com had left a gap in its business (emphases added):

> **MGT and its subsidiaries are principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space, as well as the casino industry**. The Company's acquisition strategy is designed to obtain control of assets with a focus on risk mitigation coupled with large potential upside. We plan to build our portfolio by seeking out large social and real money gaming opportunities via extensive research and analysis. Next, we will attempt to secure controlling interests for modest cash and/or stock outlays. MGT then budgets and funds operating costs to develop business operations and tries to motivate sellers with equity upside. While the ultimate objective is to operate businesses for free cash flow, there may be opportunities where we sell or otherwise monetize certain assets.

---

[21] As late as April 21, 2016, MGT described itself in an 8-K as follows:

> MGT Capital and its subsidiaries own and operate social and real money gaming sites online and in the mobile space, including MGTplay.com and SlotChamp™. In addition, the Company owns intellectual property relating to slot machines and has asserted its claims via patent infringement lawsuits. MGT also has ownership stakes in DraftDay.com, a top daily fantasy sports wagering platform and DraftDay Fantasy Sports, Inc. operator of an online entertainment marketing and rewards platform.

***

> **Following the sale of DraftDay.com, the Company has been considering all methods to create value for shareholders, including potential mergers, spin–offs, distributions and other strategic actions.**

66. By the end of 2015, as detailed above in ¶¶ 33–35, MGT had barely any cash, only two employees, no CFO, and no identifiable continuing operations that could plausibly generate revenue for the future. It "had incurred significant operating losses since inception and continues to generate losses from operations," and its auditor had expressed "substantial doubt about the Company's ability to continue as a going concern."

67. Going into early 2016, MGT's outlook somehow got even worse. As of March 31, 2016, MGT had only $189,000 in cash. And according to MGT's Quarterly Report on Form 10-Q for the second quarter of 2016, MGT ultimately had *zero* revenue, and a net loss of $7.4 million, in the first six months of 2016.

68. Second, Defendants also knew or should have known that, during the Class Period, MGT had "become engaged in ventures or promotions which have not developed to a commercial stage or the success of which is problematical." In fact, MGT has flatly admitted that, even as of the *end* of 2016 (and more than a month after the Class Period), none of the Company's cybersecurity ventures had reached a commercial stage or had even gotten past the initial stages of commercialization:

> ***There is no assurance that we will be successful in commercializing our cybersecurity products.***
>
> **Our current and currently proposed cybersecurity products are in the initial stages of commercialization, and we expect that the same will be the case with respect to the products of other businesses that we acquire.** Because of the rapidly evolving nature of the cybersecurity industry, and the constantly changing threats that cybersecurity products are intended to address, our products may require continuous and effective

> upgrades in order to obtain effective recognition and commercial traction in the cybersecurity marketplace. We cannot assure you that we will be successful in commercializing any of our cybersecurity products or, if they are commercialized, that they will be profitable for the Company.[22]

69. In fact, in MGT's 2016 10-K, Defendants further admitted that by the end of 2016, the Company had become so scaled-down and diversified from its original purpose that it could be erroneously mistaken for a "shell" company:

> The Company currently employs 2 people in management and administration at its office in Harrison, New York, 2 people in marketing and communications who work remotely, and 4 engineering and management personnel in product development at its main facility in Durham, North Carolina. The Company currently engages 4 engineers on a consulting basis, some of whom may be expected to become Company employees in the future. The Company also owns bitcoin machines in a hosted environment in Cashmere, Washington. Also, the Company has three advisory boards, a four–member Hacker Advisory Board, a two member Emerging Large Scale Technology Board and a three member Cryptocurrency Advisory Board.. At its current level of operation, the Company is not a shell company under applicable rules and regulations of the Securities and Exchange Commission. Nevertheless, because the Company has recently disposed of, and has ceased to conduct, its legacy online sports gaming business, and has only recently begun it activities in the cybersecurity space, it is possible that the Company could be confused with a shell company. This erroneous perception could have adverse consequences for the Company's market valuation, as well as for its relationships with potential customers, potential joint venture partners and other constituencies. The Company expects the risk of this perception to diminish as the level of the Company's operations increases.

70. Moreover, MGT's 2016 10-K reported *zero* revenue in 2016 from any cybersecurity businesses; in fact, the 2016 10-K did not even list cybersecurity as one of MGT's *operational segments*. Rather, the Company's only revenues from continuing operations in 2016

---

[22] MGT Capital Investments, Inc., Annual Report for the Year Ended December 31, 2016 (Form 10-K) (Apr. 20, 2017) (the "2016 10-K") at 10 (emphasis added).

were $313,000 from bitcoin mining. But even MGT's bitcoin mining operations did not "develop[] into a commercial stage" during the Class Period. MGT only started mining bitcoin on September 13, 2016—just one week before the NYSE MKT refused to list the additional shares needed to effectuate the acquisitions of D-Vasive and Demonsaw. MGT's $313,000 in revenues from bitcoin mining in 2016 (due in large part to bitcoin's price skyrocketing in the volatile market) were negligible in comparison with MGT's 2016 net operating loss of *$24.5 million*. Furthermore, the bitcoin market has been tremendously volatile throughout its entire existence, and would clearly fall under Section 1003(c)'s "success of which is problematical" trigger. As MGT itself stated in its 2016 10-K, "[w]e cannot assure you that the Company's bitcoin mining operations will remain profitable or say whether the Company will determine to continue to invest in these operations."

71. Defendants were also fully aware of the NYSE MKT's continued listing rules, and the importance of complying with such rules, for two reasons.

72. First, in both 2011 and 2012, the Company had received notices from the Exchange that it was not in compliance with Exchange rules and risked being delisted. In response to these notices, MGT worked with the Exchange to cure the deficiencies. So October 2016 was not the first time that MGT had to worry about running afoul of the listing rules.

73. Second, in its Preliminary and Definitive Proxy Statements filed respectively on July 11, 2016 and August 15, 2016, MGT sought shareholder authorization for a reverse stock split, purportedly to ensure compliance with specific sections of the Exchange's listing requirements. Both Proxy Statements described the benefits of a reverse stock split as including the following:

> *Compliance with the NYSE MKT Continued Listing Requirements*. Our Common Stock is currently listed on the NYSE MKT, and **the NYSE**

> **MKT has certain continued listing standards under which it gives consideration to market capitalization, stockholders' equity and per share selling price**. We believe that being listed on the NYSE MKT helps support and maintain liquidity of the Common Stock and company recognition and that the Reverse Stock Split at the new proposed ratio of not less than one–for–2 will increase our ability to continue to meet the continued listing standards of the NYSE MKT.[23]

74. Defendants provided this information to assure investors that they were attempting to comply with the Exchange's continued listing standards—even specifically referencing specific standards concerning "market capitalization, stockholders' equity and per share selling price." Once Defendants spoke about MGT's compliance with the Exchange's listing rules, they had a duty to speak fully and completely about the subject.

75. But Defendants made no mention of the immediate and major *actual* delisting risk they faced—that the Company had ceased to be an operating company, in violation of Section 1003(c). Instead, Defendants provided straw-man references to continued listing standards about "market capitalization, stockholders' equity and per share selling price," none of which were immediate risks.[24] Defendants thus failed to speak fully and completely about the risks of MGT being delisted.

---

[23] MGT Capital Investments, Inc., Definitive Proxy Statement (Schedule 14A) (Aug. 15, 2016) at 30 (emphasis added); MGT Capital Investments, Inc., Preliminary Proxy Statement (Schedule 14A) (Jul. 11, 2016) at 28 (emphasis added).

[24] Section 1003(a) provides for delisting the securities of an issuer that has "sustained losses from continuing operations and/or net losses in its five most recent fiscal years" and "has stockholders' equity of less than $6,000,000." According to the 2015 10-K, MGT had $6.119 million in stockholder equity.

Section 1003(b) provides for delisting when a company has fewer than 200,000 outstanding shares or 300 public shareholders. According to the 2015 10-K, MGT had over 18 million outstanding shares and 371 stockholders of record.

Section 1003(f)(v) provides for delisting when common stock is "selling for a substantial period of time at a low price per share" and "the issuer shall fail to effect a reverse split of such shares

76. The risks of being delisted were only magnified by the D-Vasive and Demonsaw Transactions, which required the Exchange's approval for the listing of 43.8 million new MGT shares as well as shareholder authorization.

77. By requesting the Exchange's approval of tens of millions of additional shares, MGT would necessarily have to put the following red flags in front of the Exchange:

a. MGT's purpose in listing the shares was to acquire two businesses that had no relation to MGT's previous business ventures, in an industry (cybersecurity) in which MGT had no experience or familiarity. In fact, in the August 15, 2016 Definitive Proxy Statement, MGT even explicitly stated that the "reason[] for the acquisition" was "because the D–Vasive Business will give the Company a *starting point* to enter into the cybersecurity industry" (emphasis added).

b. Listing 43.8 million new shares would dilute the holdings of MGT's existing shareholders by 63%, depriving them of control over the Company even if they voted in unison. The Definitive Proxy Statement even noted this explicitly, stating that after the D-Vasive and Demonsaw Transactions, "D–Vasive Sellers would hold approximately 63% of the outstanding shares of our Company and **would be our largest stockholders**. D–Vasive Sellers may be in a position to exert influence over our Company and there is no guarantee that the interests of D–Vasive Sellers will align with the interests of other stockholders."

---

within a reasonable time after being notified that the Exchange deems such action to be appropriate." A "low price per share" usually means $1, and MGT's share price was trading at over $1 for almost all the Class Period. There is also no indication that the Exchange ever asked MGT to effect a reverse split.

c. MGT had ceased to be an operating company and had no continuing operations that generated revenue and no substantial business in other industries, including the gaming industry.

d. The D-Vasive and Demonsaw Transactions would cause massive changes to MGT's corporate structure. Previously, it had been a mobile-gaming company named MGT led by Defendant Ladd, with no involvement or familiarity with cybersecurity issues. But after the D-Vasive and Demonsaw Transactions, it would be a company named "John McAfee Global Technologies" that had (at most) "a starting point to enter into the cybersecurity industry" but no continuing operations, and whose CEO was John McAfee, a controversial public figure with no recent track record in the cybersecurity industry or in any public company who was, as even MGT's 2016 10-K had to admit, "the subject of certain publicity with respect to his personal life, particularly with respect to the time when he was residing in Belize, which could be viewed as adverse to the Company."

78. By requesting the Exchange's approval of tens of millions of additional shares, MGT would virtually guarantee that the Exchange would carefully scrutinize MGT in general. And for the reasons listed above, this would greatly increase the risk that the Exchange would not only refuse to approve the listing of additional shares, but also determine that MGT was no longer in compliance with its continued listing rules and then delist MGT stock from the Exchange.

79. Moreover, MGT was highly likely to draw the Exchange's scrutiny as to whether the D-Vasive Transaction was a "reverse merger" under section 341 of the NYSE MKT Company Guide. Under section 341, if a company listed on the Exchange engages in a "reverse

merger"—i.e. a merger with an unlisted entity "resulting in a change of control of the listed issuer and potentially allowing such unlisted entity to obtain an Exchange listing"— then "it will be **eligible for continued listing on the Exchange only if the post-transaction entity meets the standards for initial listing**" (emphasis added). "In determining whether a change of control constitutes a Reverse Merger, the Exchange will consider all relevant factors, including, but not limited to, changes in the management, board of directors, voting power, ownership, and financial structure of the listed issuer. The Exchange will also consider the nature of the businesses and the relative size of both the listed issuer and the unlisted entity."

80. Under this standard, the proposed D-Vasive and Demonsaw Transactions clearly qualified as a "reverse merger." The D-Vasive and Demonsaw Transactions would dilute the holdings of MGT's existing shareholders by 63%, resulting in a clear "change of control of the listed issuer." They would also result in significant changes to not only MGT's "management, board of directors, voting power, ownership, and financial structure" but also its business plan and even its name.

81. Because the D-Vasive and Demonsaw Transactions were a reverse merger, the post-transaction entity would be "eligible for continued listing on the Exchange only if the post-transaction entity meets the standards for initial listing"—which are be considerably more stringent than the requirements for continued listing.

**<u>Defendants Continue Pumping MGT's Stock Price</u>**

82. Throughout the Class Period, Defendants continued making statements that were misleading because Defendants failed to disclose that MGT no longer qualified as an "operating company" under NYSE MKT listing requirements, and its stock was therefore in danger of being delisted.

83. On June 23, 2016, MGT issued a press release announcing that it expected to file a preliminary proxy statement that would "provide information to stockholders for voting upon the Company's announced acquisitions of D-Vasive and Demonsaw, as well as the election of John McAfee as Executive Chairman of the Board and CEO, along with other proposals." The press release stated that:

> "McAfee concluded, 'Although I am personally not known for my patience, **current management and the proposed leadership teams are committed to the highest standards of transparency and corporate governance as we prepare for the future of this Company.** A transaction of this size and type by a publicly listed company requires great attention to detail by our attorneys and accountants. **We have also held preliminary discussions with Exchange officials regarding qualifying for NASDAQ or up listing to the 'main board' of the New York Stock Exchange from NYSE MKT**.'"

(Emphasis added.)

84. The statements in MGT's June 23, 2016 press release were materially false and misleading because they failed to disclose the following adverse facts, which Defendants either knew or recklessly disregarded:

a. Defendants failed to reveal that the "announced acquisitions of D-Vasive and Demonsaw" were unlikely to close under the terms of their respective Asset Purchase Agreements because, for the reasons detailed above, Defendants knew or should have known that the Exchange was unlikely to list the shares needed to consummate the transactions.

b. Defendants failed to disclose that, for the reasons detailed above, MGT's request to the Exchange for listing additional shares was likely to cause the Exchange to (1) closely scrutinize MGT, (2) discover that MGT was not in compliance with the Exchange's continued listing requirements, and (3) delist MGT.

c. It misrepresented that Defendants "are committed to the highest standards of transparency and corporate governance as we prepare for the future of this Company," even though Defendants were concealing the fact that MGT was in direct non-compliance with NYSE listing regulations, which would cause the NYSE to delist MGT.

85. On July 8, 2016, MGT issued a press release announcing the filing of the Preliminary Proxy Statement:

> The Proxy includes information for stockholders to vote on the proposed issuance of shares to consummate the announced acquisitions of assets from D-Vasive, Inc. and Demonsaw LLC. In order to simplify these transactions, and meet certain customary tax issues, the two acquisitions have been effectively combined into one. This new structure was accomplished by D–Vasive purchasing Demonsaw, with MGT buying the combined company pending stockholder approval. MGT will acquire the same agreed-upon assets and the sellers will have received the same agreed-upon consideration. The total number of MGT common shares to be issued to D-Vasive is 43,800,000 (equaling the earlier 23,800,000 for D-Vasive and 20,000,000 for Demonsaw).
>
> Stockholders will also vote on the election of John McAfee as Executive Chairman of the Board, the Company's name change to "John McAfee Global Technologies, Inc.", along with other proposals. Subject to SEC review, and mandatory notice requirements, MGT's shareholder meeting is still expected to occur in August 2016.
>
> John McAfee, MGT's proposed Executive Chairman and Chief Executive Officer, stated, "We are pleased to file the proxy for the upcoming shareholder meeting, at which our shareholders will vote on various proposals to implement the previously announced strategic shift in MGT's business. We are excited to move a step closer towards positioning the Company to address various cyber threats through advanced protection technologies for enterprise and personal tech devices."

86. The statements in MGT's July 8, 2016 press release referenced above were materially false and misleading because they failed to disclose the following adverse facts, which Defendants either knew or recklessly disregarded:

a. Defendants failed to reveal that "the proposed issuance of shares to consummate the announced acquisitions of assets from D-Vasive, Inc. and Demonsaw LLC" was unlikely to take place because, for the reasons detailed above, Defendants knew or should have known that the Exchange was unlikely to list the shares needed to consummate the transactions.

b. Defendants failed to disclose that, for the reasons detailed above, MGT's request to the Exchange for listing additional shares was likely to cause the Exchange to (1) closely scrutinize MGT, (2) discover that MGT was not in compliance with the Exchange's continued listing requirements, and (3) delist MGT.

87. MGT's July 11, 2016 Preliminary Proxy Statement, its August 8, 2016 Preliminary Proxy Statement, and its August 15, 2016 Definitive Proxy Statement each contained the following misstatements:

a. "As a result of the APA, **we will have acquired 100% of the common stock of D-Vasive and consequently, control of the business and operations of D-Vasive.** D-Vasive is deemed the accounting acquirer while the Company remains the legal acquirer. The fair value of the net assets acquired such as, the goodwill and intangible assets were written off."

b. "*Compliance with the NYSE MKT Continued Listing Requirements*. Our Common Stock is currently listed on the NYSE MKT, and **the NYSE MKT has certain continued listing standards under which it gives consideration to market capitalization, stockholders' equity and per share selling price**. We believe that being listed on the NYSE MKT helps support and maintain liquidity of the Common Stock and company recognition and that the Reverse Stock Split at the new proposed ratio of not

less than one–for–2 will increase our ability to continue to meet the continued listing standards of the NYSE MKT."

88. These statements referenced above were materially false and misleading because they failed to disclose the following adverse facts, which Defendants either knew or recklessly disregarded:

a. Defendants failed to reveal that the acquisitions of D-Vasive and Demonsaw were unlikely to close under the terms of their respective Asset Purchase Agreements because, for the reasons detailed above, Defendants knew or should have known that the Exchange was unlikely to list the shares needed to consummate the transactions.

b. As detailed in ¶75 above, once Defendants spoke about MGT's compliance with the NYSE listing rules, they had a duty to speak fully and completely about the subject, but instead they specifically declined to discuss the one Section (1003(c)) for which MGT was in direct non-compliance. Defendants thus failed to speak fully and completely about the risks of being delisted.

c. Defendants failed to disclose that, for the reasons detailed above, MGT's request to the Exchange for listing additional shares was likely to cause the Exchange to (1) closely scrutinize MGT, (2) discover that MGT was not in compliance with the Exchange's continued listing requirements, and (3) delist MGT.

89. On July 11, 2016, MGT issued a press release further discussing the July 11, 2016 Proxy Statement:

> We have received many thoughtful questions from investors and prospective investors about the process and proposals contained in the Proxy Statement. As a public company, we take very seriously our

> responsibility for accurate and full disclosure. This press release will address several of the most frequently asked questions.
>
> ***
>
> MGT stock traded for about $0.25 prior to the public disclosure of the D-Vasive acquisition and the new relationship with John McAfee. Following the market's re-valuation to reflect that deal, the Company announced the terms of the Demonsaw deal, and the stock continued to trade at similar levels. The point here is that MGT's board didn't just wake up to a higher stock price and then decide to issue shares; **the very transactions that improved its outlook require this issuance of stock; and the transactions were entirely and fully disclosed at that time.**
>
> ***
>
> To clarify, MGT Capital Investments, Inc. as a company presently listed on NYSE MKT (or NYSE or NASDAQ if we up-list) cannot issue any shares without board or stock exchange approval. Further, with limited exceptions (relating to publicly offered sales of stock at a price higher than market price and stock splits), if the issuance exceeds 20% of the outstanding stock at the time, stockholder approval is required. Moreover, stock and stock options issued to executives must be part of an incentive plan having received prior stockholder approval. **Please do not confuse a nationally listed security like MGT with "over-the-counter" or "bulletin board" stocks. Corporate governance standards are very strict for listed companies.**
>
> ***
>
> We expect to utilize a reverse split only if required to meet initial listing requirements of the New York Stock Exchange (NYSE) or NASDAQ. The NYSE (not the NYSE MKT, where MGT is currently traded) has a minimum share price standard of $5.00 for a new listing. (Already listed stocks need to maintain a per share value $1.00 to avoid de-listing).

(Emphasis added.)

90. The statements in the July 11, 2016 press release referenced above were materially false and misleading because they failed to disclose the following adverse facts, which Defendants either knew or recklessly disregarded:

a. Defendants misrepresented that "the transactions were entirely and fully disclosed at that time" because Defendants failed to reveal that they were unlikely to close under the terms of their respective Asset Purchase Agreements as, for the reasons detailed above, Defendants knew or should have known that the Exchange was unlikely to list the shares needed to consummate the transactions.

b. As detailed in ¶75 above, once Defendants spoke about MGT's compliance with the NYSE listing rules, they had a duty to speak fully and completely about the subject, but instead they specifically declined to discuss the one Section (1003(c)) for which MGT was in direct non-compliance. Defendants thus failed to speak fully and completely about the risks of being delisted.

c. Defendants failed to disclose that, for the reasons detailed above, MGT's request to the Exchange for listing additional shares was likely to cause the Exchange to (1) closely scrutinize MGT, (2) discover that MGT was not in compliance with the Exchange's continued listing requirements, and (3) delist MGT.

91. On July 15, 2016, MGT issued a press release announcing "Sentinel MGT, an intrusion monitoring system, a cybersecurity product designed to protect corporate and enterprise intranets from sophisticated hacking threats." The press release stated the following:

> Sentinel MGT joins the other technologies acquired by MGT -- D-Vasive, Demonsaw and E-Tagged -- to make MGT the only company developing targeted solutions for all of these threats to both the consumer and enterprise markets. These technologies, taken together, comprise the world's first comprehensive Anti-Hacking system.

92. This statement was materially false and misleading because MGT had not acquired D-Vasive or Demonsaw and Defendants failed to reveal that the D-Vasive and Demonsaw Transactions were unlikely to close under the terms of their respective Asset

Purchase Agreements because, for the reasons detailed above, Defendants knew or should have known that the Exchange was unlikely to list the shares needed to consummate the transactions.

**<u>The Truth Emerges</u>**

93. On September 19, 2016, pre-market, MGT issued a press release announcing that on September 15, 2016, MGT had received a subpoena from the SEC requesting "certain information from the Company." The press release stated that MGT had no reason to believe that the Company is or will be the subject of any enforcement proceedings and was fully cooperating to comply with the SEC's request.

94. On this news, MGT stock fell $0.74, or 22.7%, to close at $2.52 on September 19, 2016.

95. On September 20, 2016, pre-market, MGT announced that the NYSE had informed the Company on September 19, 2016 that it would "not approve the listing on the Exchange of the 43.8 million shares that the Company is required to issue in order to complete the closing of the D-Vassive [sic] merger." The press release insisted that "[t]he Company and John McAfee remain committed to closing the transaction and are exploring alternatives." Later that day, MGT posted a statement on its website[25] stating in relevant part:

> **Now that shares are blocked for D-Vasive, what options are there to retain to proceed with the acquisition? How will this impact the acquisition of Demonsaw and involvement of MGT's Chief Technical Officer, Eric "Eijah" Anderson?**
>
> The New York Stock Exchange is not allowing us to issue shares to the sellers of D-Vasive. However, MGT still has fully proper and legal options to consummate the merger away from the NYSE. To be clear,

[25] MGT Capital Investments, Inc., *MGT Further Clarifies SEC Subpoena, NYSE And Other Top Shareholder Questions*, Sept. 20, 2016, https://www.mgtci.com/datastreamx/2016/9/20/shareholder-frequently-asked-questions.

> their decision was not related to any securities regulations, but rather the NYSE's own internal rulings.
>
> The acquisitions have been approved by shareholders, the MGT board, and corporate officers. Considering this support for the acquisitions, MGT has stated unequivocally that it will still pursue closing the acquisition of D-Vasive, a provider of leading edge anti-spy software, and Demonsaw, a provider of a secure and anonymous file sharing software platform. Both products are critical to the success of MGT, and without which we cannot proceed with our Company's vision.
>
> Most importantly, Mr. McAfee and Mr. Anderson are fully committed to going forward and building our Company as Chief Executive Officer and Chief Technology Officer, respectively.

96. On this news, MGT stock fell $0.63, or 25%, to close at $1.89 on September 20, 2016.

97. On October 19, 2016, shortly before market close, the NYSE MKT issued a press release stating that "the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of MGT…from the Exchange. Trading in the Company's common stock on the NYSE MKT will be suspended immediately." The press further stated that "NYSE Regulation has determined that the Company is no longer suitable for listing" and had "commenced delisting proceedings pursuant to Section 1002(c) of the NYSE MKT Company Guide that applies when a company has sold or otherwise disposed of its principal operating assets, or has ceased to be an operating company."

98. At 9:18 am EDT on October 20, MGT issued a press release stating that it was considering appealing the delisting and that MGT's common stock would begin trading over the counter under the symbol "MGTI."

99. On October 21, 2016, the stock closed at $1.29, down 45% from MGT's close of $2.35 on October 19.

100. MGT's October 19, 2016 press release provided false and misleading excuses for the Company's delisting, including:

> The Company knows of no facts or circumstances that would lead NYSE Regulation to reach its unilateral decision. The fact pattern actually produces the opposite conclusion: Notwithstanding the NYSE MKT's (also unilateral) decision to prevent the issuance of shares in connection with MGT's stockholder approved acquisition of D-Vasive and Demonsaw, MGT is indeed an operating company using any definition of those words. Moreover, the Company has not sold or disposed of its principal operating assets.
>
> It is the Company's position that the facts dramatically contradict the Exchange's decision. In recent months, MGT has acquired operating assets including two cybersecurity devices and bitcoin mining equipment and infrastructure. It currently has 15 employees and consultants, a newly signed 3-year lease for a tech center in Durham, NC, has announced the commercial release of its first cybersecurity product, and is currently a top U.S. producer of bitcoins. The bitcoin operations generate over $50,000 per month in gross profit, offsetting the $300,000 per month costs of operations. The company's preliminary balance sheet for September 30, 2016 consists of over $2.1 million in cash plus approximately $750,000 of marketable securities.

101. MGT provided similarly false and misleading excuses in an October 25, 2016 post on its website[26], which stated in relevant part:

> **Is MGT an operating company?**
>
> The NYSE asserts that MGT was suspended from the exchange because it is does not meet the criteria of an operating company. MGT maintains that using any reasonable definition of the term, we are very obviously an operating company.
>
> The determination of NYSE Staff is contradicted by objective factual realities, and we can find no evidence that any first-hand research into the matter was conducted done prior to this action. No one from NYSE visited

---

[26] MGT Capital Investments, Inc., *MGT Answers Shareholder Questions About NYSE Delisting*, Oct. 25, 2016, https://www.mgtci.com/datastreamx/2016/10/24/faq.

> our Company offices in Durham, NC or asked to see our Bitcoin facility, which is among the top bitcoin mining operations in the U.S. and is already generating regular, recurring income for MGT.
>
> It is also difficult to believe that the NYSE Staff was unaware of other very tangible and public evidence of Company operations. These include:
>
> - The offering for sale of our first cyber security hardware product, Sentinel
> - The continued expenditure of legitimate operating costs in pursuit of Company objectives
> - Consistent and transparent communication with shareholders and the public, including clear descriptions of our progress, when appropriate
> - Consistent and accurate regulatory compliance and financial reporting
> - The coherent and consistent vision and roadmap, outlined repeatedly by Mr. McAfee, Eijah and others, to transform MGT into a leading provider of cybersecurity solutions

102. Ultimately, on November 4, 2016, MGT announced that it had decided not to appeal the delisting. That MGT declined to appeal the NYSE's ruling is telling, as the excuses MGT stated are unavailing and based on factual inaccuracies, for the following reasons:

a. MGT had in fact "disposed of its principal operating assets." According to the 2016 10-K, "[i]n September 2015, the Company disposed of substantially all its equity interest in DraftDay Gaming Group, Inc., its principal gaming property, and began repositioning itself as a participant in the cybersecurity industry." Yet even as of December 31, 2015, the Company had "just begun its entry into the cybersecurity industry with the acquisition of its Sentinel product." MGT's 2016 10-K reported *zero* revenue in 2016 from any cybersecurity businesses; in fact, the 2016 10-K did not even list cybersecurity as one of MGT's *operational segments*.

b. As investors learned on April 12, 2017, the supposed "offering for sale of our first cyber security hardware product, Sentinel" was in fact merely a "limited initial release" in which "the product proved vulnerable on both the server and sensor side, and was not foolproof as I had promised."

c. MGT had not "acquired operating assets including two cybersecurity devices" "in recent months." The 2016 10-K lists no acquisitions matching this description.

d. Bitcoin mining is not enough to make MGT an "operating company" because the Company's bitcoin mining operations did not "develop[] into a commercial stage" during the Class Period. MGT only started mining bitcoin on September 13, 2016—just one week before the NYSE MKT refused to list the additional shares needed to effectuate the acquisitions of D-Vasive and Demonsaw. MGT's $313,000 in revenues from bitcoin mining in 2016, and its gross margin of $104,000, were negligible in comparison with MGT's 2016 net operating loss of *$24.5 million*. Furthermore, the bitcoin market has been tremendously volatile throughout its entire existence, and would clearly fall under Section 1003(c)'s "success of which is problematical" trigger. As MGT itself stated in its 2016 10-K, "[w]e cannot assure you that the Company's bitcoin mining operations will remain profitable or say whether the Company will determine to continue to invest in these operations."

e. MGT did not have "accurate regulatory compliance and financial reporting." According to the 2016 10-K, MGT had the following material weaknesses in internal control over financial reporting: "Lack of dual control around executing cash disbursements through Wells Fargo Bank"; "Lack of segregation of duties, especially

with respect to the lack of dual control around processing payroll"; as to Corporate Governance, "[w]eaknesses principally around the lack of segregation of duties, since most key activities have to be handled by either the SVP or the CFO"; and as to Notes Payable, Investments, and Mergers & Acquisitions, "Lack of segregation of duties and lack of documentation of control steps."

f. The fact that MGT "has 15 employees and consultants, a newly signed 3-year lease for a tech center in Durham, NC," has no bearing on the Exchange's requirement that a company have business that has developed to a commercial stage.

**Defendants Acted With the Requisite Scienter**

103. Defendants acted with scienter in that they knew, or recklessly disregarded, that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.

104. As detailed above, Defendants also acted with reckless disregard for whether the D-Vasive and Demonsaw Transactions would be consummated, and whether MGT was in violation of NYSE listing requirements and at risk of being delisted.

105. The individual Defendants have further financial and/or reputational motives, detailed below, which were not shared by other stockholders.

**Defendant McAfee Acted With the Requisite Scienter**

106. John McAfee had several motives that were not aligned with the interests of stockholders, which enabled him to take the risks of entering into the D-Vasive and Demonsaw agreements, even though it would put the Company at risk for delisting.

107. First, as detailed above at ¶¶48–49, the D-Vasive Transaction gave McAfee significant incentives to pump up MGT's stock price. In particular, MGT entered into a consulting agreement with Future Tense on May 9, 2016 that was not contingent on the closing of the D-Vasive Transaction. Under that agreement, Future Tense was to receive $250,000, plus a $250,000 cash bonus if MGT's stock price exceeded $1 for ten consecutive days, plus an additional $350,000 if MGT's stock price exceeded $2 for ten consecutive days. Both of these milestones were met during 2016—and as the 2016 10-K confirms, MTG paid Future Tense $902,000 in consulting fees. McAfee was also essentially part owner of both D-Vasive and Demonsaw, through his connection with Future Tense. If the acquisitions went through, he would benefit because Future Tense would acquire a large number of MGT shares. But even if the acquisitions fell through, D-Vasive and Demonsaw themselves would at least benefit somewhat from the months of publicity. Thus, McAfee had an interest in using the *announcements* of the D-Vasive and Demonsaw Transactions to increase MGT's stock price, even if the transactions themselves could not be consummated or even if they led to MGT's delisting.

108. Second, McAfee wanted to raise his public profile and improve his reputation. A February 2015 *USA Today* article had described Future Tense as "the last stab at relevance and respectability for the 69-year-old McAfee" as well as "his ticket to redemption in a multibillion-dollar market he helped create."[27] MGT offered all of that along with the fundraising capabilities and the higher profile of a public company that could hire McAfee's friends and buy their companies.

---

[27] Jon Swartz, *John McAfee prepares for his last stand*, USA Today, Feb. 10, 2015 4:43 p.m. ET, https://www.usatoday.com/story/tech/2015/02/10/john-mcafee-tennessee-security-legend-futuretense-alabama/21712017/.

109. And so, unsurprisingly, the May 9, 2016 press release announcing the D-Vasive Transaction was titled "John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology," and part of the deal was that MGT would be renamed to John McAfee Global Technologies, Inc. At the time, McAfee was still running for President; the flurry of publicity and the meteoric rise in MGT's stock price that followed undoubtedly generated good publicity for his campaign. If nothing else, his new position allowed him to present himself as "CEO of an exciting new cybersecurity company" while he conceded the Libertarian Party nomination for President.

110. McAfee's position as a CEO of a public company also helped deflect some of the negative publicity around the release of "Gringo: The Dangerous Life of John McAfee." In fact, on September 12, 2016, McAfee specifically used his role as CEO to issue a press release concerning the documentary, stating "[o]ver the past couple of years I have rebuilt my reputation. This comeback seems to infuriate those that have worked so hard against me, and has resulted in this latest hateful piece of fiction."

**Defendant Ladd Acted With the Requisite Scienter**

111. During the Class Period, Defendant Ladd took advantage of the inflated MGT stock price to sell a total of $468,828 in MGT stock on May 25, 2016 and May 31, 2016.

112. Furthermore, under the proposed agreement for Ladd's employment as MGT's President and COO (which shareholders ratified on September 8, 2015, but which was conditional on the D-Vasive Transaction closing), Defendant Ladd would become "entitled to receive up to 2,000,000 shares of the Company's common stock, 1/3 of which shall vest within 12 months from the execution of the agreement, another 1/3 within 18 months, and the remaining 1/3 within 24 months from the execution of the agreement." It is unlikely that Defendant Ladd

would have been able to receive this generous deal had the stock price of MGT not been artificially inflated at the time.

**Loss Causation**

113. During the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of MGT common stock. As a result, MGT common stock traded at artificially inflated prices during the Class Period.

114. Lead Plaintiff and other members of the Class purchased or otherwise acquired MGT common stock relying upon the integrity of the market price of MGT common stock and market information relating to MGT.

115. When the true facts about the Company were revealed to the market, the inflation in the price of MGT common stock was removed and the price of MGT common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

**No Safe Harbor**

116. The "Safe Harbor" warnings accompanying MGT's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability because they failed to identify important factors that could cause actual results to differ materially from those in the for-ward-looking statements.

117. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. See 15 U.S.C. §78u-5(b)(2)(A).

118. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

authorized and/or approved by an executive officer of MGT who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## Class Action Allegations

119. Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of MGT during the Class Period (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company at all relevant times, their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

120. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, MGT common stock was actively traded on the NYSE MKT. While the exact number of Class members can only be ascertained through discovery, Lead Plaintiff believes that there are at least hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by MGT and/or its transfer agent.

121. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

122. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

123. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act;

b) whether statements made by Defendants misrepresented material facts about the business and operations of MGT;

c) whether Defendants' conduct caused artificial inflation in the market for the Company's securities; and

d) whether the members of the Class have sustained damages, and if so, the proper measure of such damages.

124. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

125. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a) Defendants made public misrepresentations or failed to disclose facts during the Class Period;

b) The omissions and misrepresentations were material;

c) MGT common stock traded in an efficient market;

d) the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e) The misrepresentations would tend to induce a reasonable investor to misjudge the value of MGT common stock; and

f) Plaintiff and other members of the Class purchased MGT common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

126. At all relevant times, market for MGT common stock was open, well-developed and efficient for the following reasons, among others:

a) As a regulated issuer, MGT filed periodic public reports with the SEC; and

b) MGT regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

127. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

128. Alternatively, Plaintiff and the members of the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128

(1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Against All Defendants For Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder)**

129. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

130. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MGT securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire MGT securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

131. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence

the market for MGT securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about MGT's finances and business prospects.

132. By virtue of their positions, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

133. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. By virtue of their positions, the Individual Defendants had knowledge of the details of MGT's internal affairs.

134. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of MGT. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to MGT's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of MGT securities was artificially inflated throughout the Class Period. In ignorance of the adverse

facts concerning MGT's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired MGT securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

135. During the Class Period, MGT securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of MGT securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of MGT securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of MGT securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

136. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

137. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

138. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

139. During the Class Period, the Individual Defendants participated in the operation and management of MGT, and conducted and participated, directly and indirectly, in the conduct of MGT's business affairs. Because of their positions, they knew the adverse non-public information about MGT's misstatement of income and expenses and false financial statements.

140. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to MGT's financial condition and results of operations, and to correct promptly any public statements issued by MGT which had become materially false or misleading.

141. Because of their positions, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which MGT disseminated in the marketplace during the Class Period concerning MGT's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause MGT to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of MGT within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of MGT securities.

142. Each of the Individual Defendants, therefore, acted as a controlling person of MGT. By reason of their senior management positions and/or being directors of MGT, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, MGT to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

143. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by MGT.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

A. Determining that this action is a proper class action under Federal Rule of Civil Procedure 23, and certifying Lead Plaintiffs as Class representatives and Lead Plaintiffs' counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C. Awarding Lead Plaintiffs and the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs demand a trial by jury.

Dated: June 30, 2017

**POMERANTZ LLP**

*By: /s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Murielle J. Steven Walsh
Aatif Iqbal
600 Third Ave., 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
mjsteven@pomlaw.com
aiqbal@pomlaw.com

***Lead Counsel for Plaintiffs***

**GLANCY PRONGAY & MURRAY LLP**
Brian P. Murray (BM 9954)
Gregory B. Linkh (GL 0477)
230 Park Avenue, Suite 530
New York, New York 10169
Tel: (212) 682-5340
Email: bmurray@glancylaw.com
glinkh@glancylaw.com

***Additional Counsel for Plaintiffs***