**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE MGT CAPITAL INVESTMENTS, INC. SECURITIES LITIGATION |

No. 1:16-cv-07415 (NRB)

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
Aatif Iqbal
600 Third Avenue, Floor 20
New York, NY 10016
Phone: 212-661-1100
Fax: 917-463-1044
Email: jalieberman@pomlaw.com
Email: mjsteven@pomlaw.com
Email: aiqbal@pomlaw.com

*Lead Counsel for Plaintiffs*

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ....................................................................... 1

II.    FACTUAL BACKGROUND .......................................................................... 2

       A.     By the End of 2015, MGT Had Disposed of Its Principal Operating Assets.......... 2

       B.     As a Result, MGT No Longer Satisfied the Exchange's Continued Listing
              Requirement that It Remain an "Operating Company" ......................................... 3

       C.     John McAfee and MGT's Turnaround Plan ........................................................... 4

       D.     Defendants, Trying to Sell the Turnaround Plan, Tout MGT's Status as a Listed
              Company While Making Affirmative Misleading Statements Regarding
              Compliance with the Exchange's Listing Requirements ....................................... 5

       E.     The Acquisitions Even Further Increase the Risk of Delisting.............................. 7

       F.     MGT Is Delisted Due To Its Cessation as an Operating Company ...................... 8

III.   ARGUMENT ................................................................................................. 11

       A.     Because Defendants Touted MGT's Status as a Listed Company and Chose to
              Speak about the Exchange's Listing Requirements, They Had a Duty to Speak
              Completely and Truthfully.................................................................................... 12

       B.     MGT's Not Being an Operating Company was an Objective Material Fact, and
              Neither a Prediction nor an Opinion .................................................................... 13

       C.     The Risk of Delisting Was Extremely Material To Investors............................... 16

       D.     MGT's Cautionary Language Was Insufficient and Did Not Warn of the Specific
              Risks...................................................................................................................... 18

       E.     The Fact that NYSE Listing Requirements are Publicly Available Does Not
              Negate Defendants' Duty to Disclose the Risks of Delisting ............................... 20

       F.     Plaintiffs Have Adequately Pled Scienter............................................................ 22

       G.     Plaintiffs Have Adequately Pled Loss Causation ................................................ 24

       H.     Plaintiffs Adequately Pled Control Person Liability against Defendant McAfee  24

IV.    CONCLUSION.............................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acme Missiles & Construction Corp.*,
  43 S.E.C. 485 (1967)..................................................................................................14, 15

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
  No. 13-CV-5586 (VEC), 2014 WL 6466994, 2014 U.S. Dist. LEXIS 161472
  (S.D.N.Y. Nov. 18, 2014) ...........................................................................................21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................................11

*Caiola v. Citibank, N.A.*,
  295 F.3d 312 (2d Cir. 2002)........................................................................................12

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)........................................................................................24

*Davidoff v. Farina*,
  No. 04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638 (S.D.N.Y. Aug. 19,
  2005) ...........................................................................................................................15

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)....................................................................................................24

*Fait v. Regions Fin. Corp.*,
  655 F.3d 105 (2d Cir. 2011)........................................................................................15

*Fogarazzo v. Lehman Bros., Inc.*,
  341 F. Supp. 2d 274 (S.D.N.Y. 2004).........................................................................21

*GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*,
  838 F.3d 214 (2d Cir. 2016)........................................................................................11

*Heliotrope Gen. Inc. v. Ford. Motor. Co.*,
  189 F.3d 971 (9th Cir. 1999) ......................................................................................21

*Hunt v. All. N. Am. Gov't Income Tr., Inc.*,
  159 F.3d 723 (2d Cir. 1998)........................................................................................19

*In re AIG 2008 Sec. Litig.*,
    741 F. Supp. 2d 511 (S.D.N.Y. 2010)....................................................................19

*In re Bear Stearns Sec., Deriv. and ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)....................................................................22

*In re Carter-Wallace, Inc. Sec. Litig.*,
    220 F. 3d 36 (2d Cir. 2000)....................................................................................22

*In re CRM Holdings, Ltd.*,
    No. 10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034 (S.D.N.Y. May 10,
    2012) .......................................................................................................................15

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006)......................................................................18

*In re Gildan Activewear, Inc. Sec. Litig.*,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009)....................................................................23

*In re Global Crossing Ltd. Sec. Litig.*,
    No. 02 Civ. 910, 2005 WL 1875445, 2005 U.S. Dist. LEXIS 16232 (S.D.N.Y.
    Aug. 5, 2005) .........................................................................................................24

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
    791 F.3d 90 (D.C. Cir. 2015).................................................................................19

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    No. 11 Civ. 3658, 2012 WL 2512280, 2012 U.S. Dist. LEXIS 91004
    (S.D.N.Y. June 29, 2012)........................................................................................25

*In re MetLife Demutualization Litig.*,
    156 F. Supp. 2d 254 (E.D.N.Y. 2001) ...................................................................20

*In re MF Global Holdings Ltd. Secs. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)..............................................................18, 20

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)...................................................................................24

*In re Open Joint Stock Co., "Vimpel Communications" Sec. Litig.*,
    No. 04 CIV. 9742 (NRB), 2006 WL 647981, 2006 U.S. Dist. LEXIS 10256
    (S.D.N.Y. Mar. 13, 2006) .......................................................................................14

*In re Salix Pharm., Ltd.*,
    No. 14-CV-8925 (KMW), 2016 U.S. Dist. LEXIS 54202 (S.D.N.Y. Apr. 22,
    2016) .......................................................................................................................18

*In re SINA Corp. Sec. Litig.*,
   No. 05 Civ. 2154 (NRB), 2006 WL 2742048, 2006 U.S. Dist. LEXIS 71089
   (S.D.N.Y. Sept. 26, 2006) .........................................................................................14

*In re Vivendi S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ......................................................................................12

*Jefferson Ins. Co. v. Rouhana (In re Winstar Communs.)*,
   Nos. 01 CV 3014 (GBD), 01 CV 11522, 2006 U.S. Dist. LEXIS 7618
   (S.D.N.Y. Feb. 24, 2006) ...........................................................................................21

*King Cnty., Wash. v. IKB Deutsche Industriebank AG*,
   708 F. Supp. 2d 334 (S.D.N.Y. 2010) .......................................................................24

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991) ......................................................................................16

*Kramer v. Time Warner, Inc.*,
   No. 89 Civ. 8234 (LBS), 1990 U.S. Dist. LEXIS 14171 (S.D.N.Y. Oct. 24,
   1990), *aff'd*, 937 F.2d 767 (2d Cir. 1991) ...............................................................15

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006).......................................................................................23

*Litwin v. Blackstone Group, L.P.*,
   634 F.3d 706 (2d Cir. 2011).......................................................................................20

*Mateo v. Bristow*,
   No. 12 Civ. 5052 (RJS), 2013 WL 3863865, 2013 U.S. Dist. LEXIS 106478
   (S.D.N.Y. July 16, 2013) ...........................................................................................11

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)......................................................................................................11

*Mendell v. Amgen, Inc. (In re Amgen Inc. Sec. Litig.)*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ....................................................................21

*Meyer v. Concordia International Corp.*,
   No. 16 Civ. 6467 (RMB), 2017 WL 5083603, 2017 U.S. Dist. LEXIS 119436
   (S.D.N.Y. July 28, 2017) ...........................................................................................21

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
   761 F.3d 245 (2d Cir. 2014).......................................................................................12

*New Jersey Carpenters Heath Fund v. Royal Bank of Scotland Group, PLC*,
   709 F.3d 109 (2d Cir. 2014).......................................................................................20

*Norlin Corp. v Rooney, Pace, Inc.*,
    744 F.2d 255 (2d Cir. 1984)............................................................................16

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................22

*Propane, Inc. v. Tenexco, Inc.*,
    844 F.2d 1317 (7th Cir. 1988) ........................................................................21

*SEC v. M&A W., Inc.*,
    538 F.3d 1043 (9th Cir. 2008) ..........................................................................8

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968)............................................................................17

*SEC v. Zenergy Int'l, Inc.*,
    141 F. Supp. 3d 846 (N.D. Ill. 2015) ................................................................8

*Siebert v. Sperry Rand Corp.*,
    586 F.2d 949 (2d Cir. 1978)............................................................................21

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)............................................................................18

*Sonesta Int'l Hotels Corp. v. Wellington Assocs.*,
    483 F.2d 247 (2d Cir. 1973)......................................................................16, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................11

*United States v. Weed*,
    No. 16-2120, 2017 U.S. App. LEXIS 19550 (1st Cir. Oct. 6, 2017).................8

*Van Gemert v. Boeing Co.*,
    520 F.2d 1373 (2d Cir. 1975)..........................................................................16

*Williams v. Geier*,
    671 A.2d 1368 (Del. 1996) .............................................................................17

**Statutes**

15 U.S.C. §78u-4(b)(2) .........................................................................................22

15 U.S.C. § 78u-5(c)(1)(A)(i) ...............................................................................18

**Rules**

Fed. R. Civ. P. 8(a)(2).........................................................................................24

Fed. R. Civ. P. 12(b)(6)..................................................................................................................11

Fed. R. Civ. P. 12(g) ...................................................................................................................11

## I.    PRELIMINARY STATEMENT

This is a federal securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired the securities of MGT Capital Investments, Inc. ("MGT" or the "Company") between May 9, 2016 and October 19, 2016, both dates inclusive (the "Class Period"), seeking remedies against MGT and certain of its top officials under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

Before and during the Class Period, MGT was in continued non-compliance with Sections 1002(c) and 1003(c) of the NYSE MKT Company Guide, which govern a security's eligibility for continuing to be listed on the NYSE MKT (the "Exchange"). While Defendants affirmatively and repeatedly made statements informing investors of the steps MGT was taking to ensure compliance with the Exchange's listing requirements, these statements were misleadingly incomplete because they failed to mention the true risks of being delisted due to the Company's ongoing violation of the requirement under sections 1002(c) and 1003(c) that it remain an "operating company." As Defendants themselves raised the delisting issue in SEC filings, they had a duty to speak truthfully and completely about it. Instead, Defendants misrepresented the true risks of delisting by discussing in detail the listing requirements concerning "market capitalization, stockholders' equity and per share selling price" yet failing to disclose the most serious delisting risk—that MGT was no longer an "operating company."

Ultimately, the Exchange predictably delisted MGT for these reasons, which in turn prevented the consummation of several key transactions that Defendants touted during the Class Period. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in MGT's stock price following each of these revelations, Plaintiff and other Class members have suffered significant losses and damages.

## II.     FACTUAL BACKGROUND

### A.  By the End of 2015, MGT Had Disposed of Its Principal Operating Assets

When the Company's stock went public in 2000, its name was "HTTP Technology, Inc." and it focused on "strategic acquisitions in…Internet-related businesses." Since then, the Company has struggled to find its footing, changing its business strategy and self-description numerous times. In 2002, it was a "medical imaging" company called "Medicsight, Inc." By 2007 it was a "health-care information technology" company under its current name. None of this was profitable, so the Company survived almost entirely through "debt and equity financings," resulting in repeated stock price devaluations. Its stock price fell from $120 in 2007 to under $1 in 2011, and it had to conduct a reverse stock split in March 2012 to avoid being delisted by the Exchange. CAC ¶¶ 18–21.[1]

After Defendant Ladd became CEO in 2012, MGT switched to "acquiring, developing and monetizing assets in the online and mobile gaming space…" In April 2014, MGT finally acquired a promising venture: DraftDay, the "crown jewel in our portfolio" that pushed MGT's 2014 revenues to its highest level in years. But MGT was running out of cash, revenues were still eclipsed by operating expenses (2014 was a net loss of $1.6 million), and its stock price kept falling (from $2.91 at the start of 2014 to $0.37 in March 2015), making it difficult to raise funds through equity financing. In August 2015, MGT had to disclose "substantial doubt" about its "ability to continue as a going concern." Ultimately, MGT's liquidity crunch gave it no choice: in September 2015, MGT sold all but 11% of its stake in DraftDay. But by October 1, 2015, MGT's stock price was down to $0.20. Still desperate for capital, MGT raised $700,000 by selling 2.8 million shares plus options to buy 5.6 million shares at $0.25 each. CAC ¶¶ 23–31.

---

[1] "CAC ¶_" refers to paragraphs of the Complaint. References to "Davis Ex." are to the exhibits to the Declaration of Jeffrey W. Davis dated August 29, 2017.

By the end of 2015, MGT had essentially disposed of its principal operating assets and ceased to be an operating company. It had minimal assets, only $398,000 in cash, and neither a discernible business plan nor any continuing operations that could plausibly generate revenue in the future. It had slashed expenses to the point of having no CFO and *only two employees*, but still had negative $2.4 million in cash flows from operations in 2015. And revenues were not likely to increase: almost all of its revenue from continuing operations in 2015 came from a "non-recurring gaming patent licensing fee." CAC ¶¶ 31–35, 61–70.

Things got even worse in early 2016. As of March 31, 2016, MGT had only $189,000 in cash. In the first half of 2016, MGT had *zero revenue* and a net loss of $7.4 million. CAC ¶¶ 31–35, 61–70. And as late as April 13, 2016, it still had no discernible business plan: it described itself in its 2015 10-K as be "principally engaged in the business of acquiring, developing and monetizing assets in the online and mobile gaming space," CAC ¶ 65—even though, as it admitted in its 2016 10-K, "[i]n September 2015, the Company *disposed of substantially all its equity interest* in DraftDay Gaming Group, Inc., *its principal gaming property*." CAC ¶ 102(a).

**B.   As a Result, MGT No Longer Satisfied the Exchange's Continued Listing Requirement that It Remain an "Operating Company"**

As an issuer with stock listed on the NYSE MKT (the "Exchange"), MGT was subject to NYSE MKT Company Guide, which governs a security's eligibility for continued listing on the Exchange. According to Section 1002(c) of that guide, the Exchange will "consider the suspension of trading in, or removal from listing or unlisted trading of, any security when, in the opinion of the Exchange…the issuer has…*ceased to be an operating company*." CAC ¶ 62 (emphasis added). As further detailed in Section 1003(c), the "*Exchange will normally consider suspending dealings in, or removing from the list*, securities of an issuer… if the issuer has sold or otherwise *disposed of its principal operating assets* or has *ceased to be an operating*

*company* or has *discontinued a substantial portion of its operations* or business for any reason whatsoever." Davis Ex. 17 at 3 (emphasis added). In particular, "[w]here the issuer has *substantially discontinued the business that it conducted at the time it was listed* or admitted to trading, and has become engaged in ventures or promotions which have *not developed to a commercial stage or the success of which is problematical*, it shall not be considered an operating company." *Id*.

After September 2015—when MGT admittedly "*disposed of substantially all its equity interest* in…*its principal gaming property*," CAC ¶ 102(a) (emphasis added)—MGT no longer satisfied this standard. MGT was no closer to satisfying this standard at the end of 2015, when it had barely any cash, only two employees, no CFO, and no continuing operations that could plausibly generate revenue for the future. Likewise on March 31, 2016, when it had only $189,000, and up to the beginning of the Class Period, when it still had no viable continuing operations. CAC ¶¶ 31–35, 61–70. Accordingly, Defendants knew or should have known that MGT was in violation of Section 1003(c) and was thus likely to be delisted.

## C.  John McAfee and MGT's Turnaround Plan

In April 2016, ATG Capital LLC introduced Defendant Ladd to Defendant John McAfee. Together, they agreed to transform MGT into a cybersecurity company named John McAfee Global Technologies, Inc., with Defendant McAfee as its Executive Chairman and CEO. As part of the transformation, MGT would acquire two technology startups in which McAfee was involved: D-Vasive Inc., a provider of anti-spy software, and Demonsaw LLC, a "provider of a…file sharing software platform." They agreed that ATG Capital LLC and certain other accredited investors (together the "ATG Group") would finance the deals by providing bridge

4

loans to D-Vasive and Demonsaw in exchange for promissory notes that would automatically convert into MGT shares upon closing of the acquisitions. CAC ¶¶ 42-49; 56-58.

On May 9, 2016, MGT announced its intention to become a cybersecurity company named John McAfee Global Technologies, Inc., with Defendant McAfee as its Executive Chairman and CEO, and that it had entered into an agreement to acquire D-Vasive Inc. (the "D-Vasive Transaction"). Then on May 26, 2016, MGT announced that it had entered into an agreement to acquire Demonsaw LLC (the "Demonsaw Transaction").[2] McAfee began promoting his "new company" with a flurry of tweets and Facebook posts, and MGT paid for a stock promotional campaign.[3] As a result, MGT's stock price skyrocketed at unprecedented trading volume, going from $0.36 on May 6, 2016 to $4.15 on May 17, 2016, ultimately settling in the $3–4 range over the summer of 2016. CAC ¶¶ 46–56.

**D. Defendants, Trying to Sell the Turnaround Plan, Tout MGT's Status as a Listed Company While Making Affirmative Misleading Statements Regarding Compliance with the Exchange's Listing Requirements**

During the Class Period, Defendants frequently assured investors by touting MGT's status as a listed company. For example, in the May 26, 2016 press release announcing the Demonsaw acquisition, McAfee stated "[a]s a *listed company with proper corporate governance*

---

[2] Upon closing, D-Vasive shareholders would receive $300,000 in cash and 23.8 million MGT shares, and Demonsaw shareholders would receive 20 million MGT shares. As planned, the ATG Group financed the deals by providing bridge loans of $100,000 and $750,000 to D-Vasive and Demonsaw respectively in exchange for notes that would automatically convert into MGT shares upon closing. CAC ¶¶ 42-49; 56–58.

[3] The deals gave McAfee significant incentives, not shared by other investors, to pump MGT's stock price to new heights: (1) as CEO, he would receive 3 million MGT stock options at a strike price of $1; (2) his wife owned 33% of Future Tense, which would receive MGT shares through its stakes in D-Vasive and Demonsaw; and (3) under a consulting agreement, Future Tense would receive a $600,000 cash bonus if MGT's stock exceeded $2 for ten consecutive days. CAC ¶¶ 48-49.

*and regulatory standards*, MGT will be the vehicle I use to create wealth for all stockholders." CAC ¶ 56 (emphasis added). In a June 23, 2016 press release, McAfee assured investors that "[a] transaction of this size and type by a *publicly listed company requires great attention to detail* by our attorneys and accountants" and claimed to have "held preliminary discussions with Exchange officials regarding qualifying for NASDAQ or up listing to the 'main board' of the New York Stock Exchange." CAC ¶ 83 (emphasis added). On July 11, 2016, when MGT's investors had become particularly worried about stock dilution resulting from the acquisitions, Defendants issued a press release assuring them that MGT "as a company *presently listed on NYSE MKT* (or NYSE or NASDAQ if we up-list) cannot issue any shares without board or stock exchange approval" and that investors should not "confuse a *nationally listed security like MGT* with 'over-the-counter' or 'bulletin board' stocks" because "*[c]orporate governance standards are very strict for listed companies*." CAC ¶ 89 (emphasis added).

Defendants also endeavored to reassure investors that MGT complied with the Exchange's listing requirements and was working to remain in compliance. *See, e.g.,* CAC ¶¶ 56, 83, 89. In particular, they specifically discussed the continued listing standards for "market capitalization, stockholders' equity and per share selling price" and detailed MGT's plan to conduct a reverse stock split to ensure compliance, stating in MGT's proxy statements:

> *Compliance with the NYSE MKT Continued Listing Requirements*. Our Common Stock is currently listed on the NYSE MKT, and the NYSE MKT has certain continued listing standards under which it gives consideration to market capitalization, stockholders' equity and per share selling price. We believe that being listed on the NYSE MKT helps support and maintain liquidity of the Common Stock and company recognition and that the Reverse Stock Split at the new proposed ratio of not less than one–for–2 will increase our ability to continue to meet the continued listing standards of the NYSE MKT.

CAC ¶ 73. Defendants provided this information to assure investors that they were attempting to comply with the Exchange's continued listing standards. Once Defendants spoke about MGT's compliance with the Exchange's listing rules, they had a duty to speak fully and completely about the subject. Instead, Defendants provided detailed discussions of standards that posed no immediate risks but did not mention the immediate and major *actual* delisting risk—that MGT was not an operating company as required by sections 1002(c) and 1003(c).

### E.  The Acquisitions Even Further Increase the Risk of Delisting

The risks of being delisted were only magnified by the D-Vasive and Demonsaw Transactions. To close the deals, MGT needed to issue and list 43.8 million new MGT shares to pay the merger consideration. This would require shareholder authorization as well as approval from the Exchange. But any request for the Exchange's approval of tens of millions of additional shares would necessarily put major red flags in front of the Exchange, virtually guaranteeing that the Exchange would scrutinize MGT's operations more generally, and not only refuse to list the new shares but also realize MGT was no longer an operating company and should be delisted.

For example, any request would make clear to the Exchange that MGT (1) had "substantially discontinued the business that it conducted at the time it was listed," had "disposed of substantially all its equity interest in…its principal gaming property," and had "ceased to conduct its legacy online sports gaming business"; (2) had no other ventures that had "developed to a commercial stage"; and (3) planned to issue 43.8 million new shares—diluting its existing shareholders by *63%*—all to acquire two businesses that would "give the Company a *starting point*" in an unfamiliar new industry. CAC ¶¶ 69, 77, 102(a).

Moreover, because the D-Vasive and Demonsaw Transactions would result in "a change of control of the listed issuer" and transform MGT into a completely different company—with a

new name, new CEO, and new business strategy—they would constitute a "reverse merger," triggering an even higher level of Exchange scrutiny. CAC ¶¶ 79–81; *see generally SEC v. M&A W., Inc.*, 538 F.3d 1043, 1046 (9th Cir. 2008) (describing reverse mergers and noting they often involve "a shell company with minimal assets and liabilities and no actual operations").[4] In fact, many criminal pump-and-dump schemes have fact patterns involving a reverse merger, a steep subsequent stock price increase, and "promissory notes, which could be converted into shares of stock"—all these fact patterns were also present in the D-Vasive and Demonsaw Transactions.[5] Nonetheless, in numerous statements during the Class Period touting the planned D-Vasive and Demonsaw Transactions, Defendants failed to reveal that they were unlikely to be consummated because of the major risks stated above. CAC ¶¶ 53, 60, 84, 86, 88, 90, 92.

**F. MGT Is Delisted Due To Its Cessation as an Operating Company**

These risks materialized. On September 19, 2016, the Exchange informed MGT that it would not approve the listing of the 43.8 million shares necessary for the D-Vasive Transaction and Demonsaw Transaction, causing MGT stock to fall $0.63, or 25%, to close at $1.89 on September 20, 2016. CAC ¶¶ 95–96. On October 19, 2016, the Exchange informed MGT that it was moving to delist MGT's stock, forcing it to trade over the counter. CAC ¶¶ 97-98. On October 21, 2016, MGT's stock closed at $1.29, down 45% from its close of $2.35 on October 19, 2016. CAC ¶ 99.

---

[4] As Defendants later acknowledged, MGT could easily "be confused with a shell company" because it had "recently disposed of, and has ceased to conduct, its legacy online sports gaming business" and "only recently begun its activities in the cybersecurity space." CAC ¶ 69.

[5] *See United States v. Weed*, No. 16-2120, 2017 U.S. App. LEXIS 19550, at *2-3 (1st Cir. Oct. 6, 2017) (describing a "pump and dump scheme" in which defendants would lure a private company into a reverse merger with a public shell company, have stock promoters artificially inflate the stock price, and then "convert their promissory notes into freely tradable stock, sell their overvalued shares to an unwitting public, and stop investing in the company, which would soon collapse"); *SEC v. Zenergy Int'l, Inc.*, 141 F. Supp. 3d 846, 847 (N.D. Ill. 2015) (same).

In an October 19, 2016 press release and then an October 25, 2016 posting on its website, MGT futilely attempted to assure investors that it was in fact an operating company. But even after being delisted, MGT was only able to offer statements that were either factually inaccurate or irrelevant to the Exchange's actual definition of an "operating company"— demonstrating that there was simply no reasonable basis for MGT to claim it was an operating company.

Specifically, MGT's press release stated as follows:

> It is the Company's position that the facts dramatically contradict the Exchange's decision. In recent months, MGT has acquired operating assets including two cybersecurity devices and bitcoin mining equipment and infrastructure. It currently has 15 employees and consultants, a newly signed 3-year lease for a tech center in Durham, NC, has announced the commercial release of its first cybersecurity product, and is currently a top U.S. producer of bitcoins. The bitcoin operations generate over $50,000 per month in gross profit, offsetting the $300,000 per month costs of operations. The company's preliminary balance sheet for September 30, 2016 consists of over $2.1 million in cash plus approximately $750,000 of marketable securities.

CAC ¶ 100. MGT then, on its website, purported to provide reasons why it believed it was an operating company, claiming that its bitcoin facility was "already generating regular, recurring income" and that other "tangible and public evidence of Company operations" included:

- The offering for sale of our first cyber security hardware product, Sentinel
- The continued expenditure of legitimate operating costs in pursuit of Company objectives
- Consistent and transparent communication with shareholders and the public, including clear descriptions of our progress, when appropriate
- Consistent and accurate regulatory compliance and financial reporting
- The coherent and consistent vision and roadmap, outlined repeatedly by Mr. McAfee, Eijah and others, to transform MGT into a leading provider of cybersecurity solutions.

CAC ¶ 101. But these assertions did nothing to address the Exchange's actual definition of "operating company" under Section 1003(c), in that they completely ignored the facts that (1)

MGT had "substantially discontinued the business that it conducted at the time it was listed" and (2) any new business ventures had "not developed to a commercial stage" and/or were "problematical" in terms of ultimate financial success. CAC ¶¶ 68–70, 102.

Nor did these assertions constitute "tangible and public evidence of Company operations." First, MGT's 2016 10-K reported zero revenue in 2016 from any cybersecurity businesses; in fact, the 2016 10-K did not even list cybersecurity as one of MGT's *operational segments*. CAC ¶ 102(a). Second, as investors learned on April 12, 2017, the supposed "offering for sale of our first cyber security hardware product, Sentinel" was in fact merely a "limited initial release" in which "the product proved vulnerable on both the server and sensor side, and was not foolproof as I had promised." CAC ¶ 102(b). Accordingly, such operations had "not developed to a commercial stage."

Third, MGT's Bitcoin mining operation had not developed to a commercial stage and its success was highly problematical. MGT only started mining bitcoin on September 13, 2016— just one week before the Exchange refused to list the additional shares. MGT's $313,000 in revenues from bitcoin mining in 2016, and gross margin of $104,000, were negligible in comparison with its 2016 net operating loss of *$24.5 million*. Furthermore, the bitcoin market has been tremendously volatile throughout its entire existence and would clearly fall under Section 1003(c)'s "success of which is problematical" trigger. As MGT itself stated in its 2016 10-K, it could not "assure you that the Company's bitcoin mining operations will remain profitable or say whether the Company will determine to continue to invest in these operations." CAC ¶ 102(d).

Fourth, the "expenditure of legitimate operating costs," the number of "employees and consultants," a "newly signed 3-year lease," "communication with shareholders and the public," "regulatory compliance and financial reporting," and even the supposed "vision and roadmap"

all have no bearing on the Exchange's requirement that a company have operations that have developed to a commercial stage. CAC ¶ 102(f).

Recognizing that its arguments were specious, on November 4, 2016, MGT announced that it had decided not to appeal the delisting. CAC ¶ 102.

## III.   ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether the plaintiff may be entitled to relief under any reasonable reading of the complaint. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-22 & n.4 (2007). A complaint need only contain "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" supporting the claims. *Id*. at 545.

To state a claim under Section 10(b) of the Exchange Act, a complaint must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (citation omitted).[6]

---

[6] Defendants contest only the first element and have thus waived their right to challenge the other elements of §10(b). *See* Fed. R. Civ. P. 12(g); *Mateo v. Bristow*, No. 12 Civ. 5052 (RJS), 2013 WL 3863865, at *8, 2013 U.S. Dist. LEXIS 106478, at *26 (S.D.N.Y. July 16, 2013).

**A. Because Defendants Touted MGT's Status as a Listed Company and Chose to Speak about the Exchange's Listing Requirements, They Had a Duty to Speak Completely and Truthfully**

During the Class Period, Defendants frequently assured investors that MGT stock was a "nationally listed security" subject to "very strict" "[c]orporate governance standards," and that MGT complied with the Exchange's listing requirements and was working to maintain compliance. *See, e.g.,* CAC ¶¶ 56, 83, 89. In particular, they specifically discussed the Exchange's continued listing standards for "market capitalization, stockholders' equity and per share selling price" and detailed MGT's plan to conduct a reverse stock split as a way to "increase our ability to continue to meet the continued listing standards of the NYSE MKT." CAC ¶¶ 73–74.

Defendants provided this information to assure investors that, despite MGT's new ventures and precarious financial situation, MGT would continue to meet the Exchange's listing requirements. But "[i]t is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.'" *In re Vivendi S.A. Sec. Litig.,* 838 F.3d 223, 258 (2d Cir. 2016) (quoting *Meyer v. Jinkosolar Holdings Co., Ltd.,* 761 F.3d 245, 250 (2d Cir. 2014)). Once a party chooses to speak, it has a "duty to be both **<u>accurate</u>** and **<u>complete</u>**." *Caiola v. Citibank, N.A.,* 295 F.3d 312, 331 (2d Cir. 2002) (emphasis added). Because Defendants voluntarily chose to speak about the Exchange's continued listing standards and the risks of delisting, they had a duty to speak the complete truth about the subject.

However, while purportedly detailing MGT's efforts to maintain compliance with Exchange listing requirements with respect to market capitalization, stockholders' equity and per share selling price (governed respectively by sections 1003(a), (b), and (f)(v)), Defendants made

no mention of the major *actual* delisting risk MGT faced: that MGT was not an "operating company" as it had "***substantially discontinued the business*** that it conducted at the time it was listed" and had "become engaged in ventures or promotions which ***have not developed to a commercial stage*** *or* ***the success of which is problematical***." Davis Ex. 17 at 3 (emphasis added). Defendants thus concealed the whole and complete truth about the true risks of delisting.

**B.  MGT's Not Being an Operating Company was an Objective Material Fact, and Neither a Prediction nor an Opinion**

Contrary to Defendants' contentions, that MGT was never an operating company during the Class Period was a *fact*—it was not a "negative characterization" or "conclusion," it did not depend on speculation about how the Exchange might use discretionary authority, and it was neither a close call nor subject to reasonable differences of opinion. Nor did Defendants need to make "pessimistic predictions" in order to know of the high risk of being delisted by the Exchange as a result. *See* Defs.' Br. at 1, 19, 22.

Defendants claim to "believe…that [MGT] was and is an operating company" and purport to be mystified by the idea that they should have "somehow anticipated" how the Exchange might apply its "subjective and discretionary standards for what qualifies as an operating company." Defs.' Br. at 1, 9. To be fair, there are parts of Section 1002 that set forth subjective and discretionary standards—for example, Section 1002(e) asks whether "any other event shall occur or any condition shall exist which makes further dealings on the Exchange unwarranted," *see* Davis Ex. 17 at 1. But none of those are relevant here, and Sections 1002(c) and 1003(c) set forth a straightforward definition of an "operating company."

Defendants call that definition "facially subjective and discretionary," but they can point to no reasonable basis for the proposition that MGT actually *was* an operating company at any point during the Class Period. Well before the Class Period, MGT had "substantially

discontinued the business that it conducted at the time it was listed." As it admitted in its 2016 10-K, "[i]n September 2015, the Company *disposed of substantially all its equity interest* in DraftDay Gaming Group, Inc., *its principal gaming property*." CAC ¶ 102(a). Thus, by the beginning of the Class Period, MGT had "disposed of its principal operating assets" and "discontinued a substantial portion of its operations or business"—and had thus "ceased to be an operating company" in violation of the Exchange's continued listing standards.[7] That conclusion does not require any clairvoyance, speculation, guess, or opinion. This risk is plainly evident from a mere reading of the NYSE's definition of "operating company." Especially given that Defendants affirmatively raised other risks of delisting to investors, there was no justification for concealing the "operating company" risk.[8]

Likewise, at no point in the Class Period was there a reasonable basis for the proposition that MGT's newer ventures had "developed to a commercial stage." This is confirmed by MGT's

---

[7] *See Acme Missiles & Construction Corp.*, 43 S.E.C. 485 (1967) (rejecting argument that "only a total cessation of operations provides a basis for delisting" and upholding delisting of construction company whose "construction work has been substantially reduced").

[8] Defendants cite cases for its argument about not having to make "pessimistic predictions," but they are inapposite. In *In re SINA Corp. Sec. Litig.*, No. 05 Civ. 2154 (NRB), 2006 WL 2742048, 2006 U.S. Dist. LEXIS 71089, at *28 (S.D.N.Y. Sept. 26, 2006), there was no "allegation that defendants could have foreseen the eventual crackdown [by the Chinese government] on SINA's advertising." The court even acknowledged that "had SINA known of the government's intentions, its disclosure obligations might have been different." *Id*. By contrast here, the fact that MGT was not an "operating company" was plainly evident to Defendants, and Defendants knew or should have known that they were in noncompliance with the definition of "operating company" in the NYSE Company Guide, especially since they were actively trying to ensure compliance with related listing requirements in the same section.

Similarly, in *In re Open Joint Stock Co., "Vimpel Communications" Sec. Litig.*, No. 04 CIV. 9742 (NRB), 2006 WL 647981, at *6, 2006 U.S. Dist. LEXIS 10256, at *19 (S.D.N.Y. Mar. 13, 2006), there were no allegations that "VimpelCom should have known that the August 2004 tax inspection would result in any liability." Here, by contrast, Defendants knew or should have known, simply by comparing their business operations with the definition in the NYSE Company Guide, that MGT was not an "operating company."

response to being delisted, when it tried to assure investors that it was in fact an operating company but only managed to provide statements that were either factually inaccurate or irrelevant to the definition of an "operating company." CAC ¶ 102; *supra* at 8–11. And in its 2016 10-K, MGT had to acknowledge that its "current and currently proposed cybersecurity products [were] in the ***initial stages of commercialization***" and that MGT even "could be confused with a shell company" because it had "recently disposed of, and has ***ceased to conduct, its legacy online sports gaming business***, and has ***only recently begun it activities in the cybersecurity space***." CAC ¶¶ 68–69.[9] *See Acme Missiles & Construction Corp.*, 43 S.E.C. 485

---

[9] Defendants cite cases for their argument about not having to disclose negative "inferences" or "characterizations," but they are inapposite. In *In re CRM Holdings, Ltd.*, No. 10 Civ. 975 (RPP), 2012 U.S. Dist. LEXIS 66034, at *12, 82, 84 (S.D.N.Y. May 10, 2012), the court found no duty to disclose that a trust was "underfunded" because "the term 'underfunded' describes a specific determination" by the regulator using "its own regulatory criteria" on the basis of specific "financial reports, including independently certified audited financial statements and actuarial reports" that the regulator had not even received at the time of the alleged nondisclosure. The court further noted that, at best, the underfunding allegations were "merely characterizations of the allegation that the trust had inadequate loss reserves"—and the loss reserves themselves were "by their nature…extremely conjectural" "opinions" that plaintiffs had not alleged were false. *See also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) ("the adequacy of loan loss reserves is not a matter of objective fact"). But here, whether MGT was an operating company did not depend on the application of esoteric regulatory criteria or complex, contested actuarial analysis. It required only applying the definition of "operating company" set forth in section 1003(c) to the uncontested business model of MGT.

In *Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638, at *34–35 (S.D.N.Y. Aug. 19, 2005), the allegedly undisclosed fact was simply not true—the court found no duty to disclose that a business plan was "'undercapitalized' in the sense that…skilled investors knowing all of the relevant facts about the business plan would have concluded that the company was doomed to failure" because, in fact, "sophisticated investors with the most intimate knowledge…did not think that the company was 'undercapitalized.'" Here, by contrast, no reasonable investor could find that MGT met the Exchange's definition of "operating company."

In *Kramer v. Time Warner, Inc.*, No. 89 Civ. 8234 (LBS), 1990 U.S. Dist. LEXIS 14171, at *10-11 (S.D.N.Y. Oct. 24, 1990), *aff'd*, 937 F.2d 767 (2d Cir. 1991), defendants "disclosed in clear terms that just before the merger, Warner would be resetting the resale price to equal the

(1967) (activities of subsidiaries whose products were "still in the development stage" were of "no material significance" in determining if issuer was an operating company).

### C.  The Risk of Delisting Was Extremely Material To Investors

The danger of MGT's stock being delisted was highly material to investors. As the Second Circuit has noted several times, being listed on the NYSE "protects the liquidity of shares, and reassures shareholders and potential purchasers that the extensive NYSE listing requirements are being met." *Norlin Corp. v Rooney, Pace, Inc.*, 744 F.2d 255, 268 (2d Cir. 1984) (affirming preliminary injunction because NYSE delisting constitutes "irreparable harm"). Investors place great stock in these protections:

> [T]o the American investing public listing on the New York Stock Exchange carries with it implicit guarantees of trustworthiness. The public generally understands that a company must meet certain qualifications of financial stability, prestige, and fair disclosure, in order to be accepted for that listing, which is in turn so helpful to the sale of the company's securities. Similarly it is held out to the investing public that by dealing in securities listed on the New York Stock Exchange the investor will be dealt with fairly and pursuant to law.

*Van Gemert v. Boeing Co.*, 520 F.2d 1373, 1381 (2d Cir. 1975).

Accordingly, the Second Circuit has found materially misleading a tender offeror's failure to disclose "the *prospect* that if its offer should be fully successful, [the acquiree's] common stock could have lost its listing privileges." *Sonesta Int'l Hotels Corp. v. Wellington*

---

expected value of the Merger Consideration and that this adjustment was consistent with defendants' reading of the Equity Plan." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 776 (2d Cir. 1991). Plaintiff alleged that the proposed adjustment was not actually authorized by the Equity Plan and that defendants had "fraudulently failed to characterize the adjustment to the Equity Plan as illegal." *Id*. The court rejected this claim because "[i]f a shareholder wished to contest the legality of the adjustment, the disclosure provided all the information necessary to bring an action under state law." *Id*. In contrast, MGT did not disclose any information that shareholders could use to seek any such remedies on their own.

*Assocs.*, 483 F.2d 247, 253 (2d Cir. 1973) (emphasis added). Even though there was no risk of delisting in that case unless the offeror successfully purchased 1 million shares through the tender offer, the court nevertheless found that "the risk of delisting was sufficiently appreciable to require disclosure." *Id*. at 254. Even if delisting was contingent or unlikely, materiality was not solely a question of "'the indicated probability that the event will occur'" but also required balancing that with "the anticipated magnitude of the event in light of the totality of the company activity.'" *Id*. (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968)). And delisting would have been *extremely* important to investors:

> Loss of listing on the Exchange would deprive Sonesta shareholders of a ready market for their shares and of the protection of certain Exchange requirements, including its disclosure rules. The possibility of losing these advantages could certainly have been of importance to a Sonesta shareholder in deciding whether to retain some Sonesta shares or to tender all.

*Id.*; *see also Williams v. Geier*, 671 A.2d 1368, 1383 (Del. 1996) ("The possibility of NYSE delisting, which could decrease share value, is certainly a fact that a reasonable stockholder would want to know before casting his or her vote.").

Defendants themselves knew of the importance and prestige of being listed and the risks of being delisted. In the May 26, 2016 press release announcing the Demonsaw acquisition, McAfee stated "[a]s a ***listed company with proper corporate governance and regulatory standards***, MGT will be the vehicle I use to create wealth for all stockholders." CAC ¶ 56 (emphasis added). In a June 23, 2016 press release, McAfee assured investors that "[a] transaction of this size and type by a ***publicly listed company requires great attention to detail*** by our attorneys and accountants" and claimed to have "held preliminary discussions with Exchange officials regarding qualifying for NASDAQ or up listing to the 'main board' of the New York Stock Exchange." CAC ¶ 83 (emphasis added). On July 11, 2016, when MGT's

17

investors had become particularly worried about stock dilution resulting from the acquisitions, Defendants issued a press release assuring them that MGT "as a company *presently listed on NYSE MKT* (or NYSE or NASDAQ if we up-list) cannot issue any shares without board or stock exchange approval" and that investors should not "confuse a *nationally listed security like MGT* with 'over-the-counter' or 'bulletin board' stocks" because "*[c]orporate governance standards are very strict for listed companies*." CAC ¶ 89 (emphasis added).

### D. MGT's Cautionary Language Was Insufficient and Did Not Warn of the Specific Risks

Defendants' assertion that "MGT repeatedly disclosed, even before the Class Period began, the risk that its stock might be delisted from the NYSE MKT Exchange," Def. Br. at 19, is misleading. Adequate cautionary language under the PSLRA must identify "important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "'To avail themselves of the safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information.'" *In re MF Global Holdings Ltd. Secs. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010)). That means "the relevant cautionary language must be prominent and specific, and must directly address exactly the risk that plaintiffs claim was not disclosed." *Id.* (quotation marks omitted); *see also In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102 (S.D.N.Y. 2006) ("cautionary language must precisely address the substance of the specific statement or omission that is challenged"). "Defendants cannot escape liability by referring generally to every factor that has ever been mentioned in any one of their public statements or SEC filings, because such a broad disclaimer fails to alert investors to the specific risks they are facing." *In re Salix Pharm., Ltd.*, No. 14-CV-8925 (KMW), 2016 U.S.

18

Dist. LEXIS 54202, at *36 (S.D.N.Y. Apr. 22, 2016). Defendants' risk disclosures did not warn of the specific risks due to MGT's cessation as an "operating company."

Defendants point to language in their 2015 10-K stating that "[i]f our Common stock is delisted from the NYSE MKT LLC, the Company would be subject to the risks relating to penny stocks…." (Defs.' Br. at 5.) But this language merely *referenced* the possibility of MGT stock being delisted due to possible future events concerning stock price and volume—it did not *mention* the "important factors" affecting the *likelihood* of being delisted, much less the high likelihood of being delisted due to MGT's cessation as an "operating company." CAC ¶75. "[W]arnings of specific risks…do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re AIG 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (citation omitted); *see also Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) (defendants' warning "that the Fund's hedging maneuvers might fail" did not adequately disclose the fact that "the Fund would have no opportunity to use hedging maneuvers"). Defendants thus failed to speak fully and completely about the risks of MGT being delisted.

Moreover, the exact same language appeared in MGT's pre-Class Period 2013 10-K and 2014 10-K, strongly suggesting that it was mere boilerplate. *Compare* Davis Ex. 2 at 14 *with* Ex. 3 at 14 *and* Ex. 4 at 10. Cautionary language is highly unlikely to be meaningful if it "remain[s] unchanged despite a significant change in circumstances of material importance to an investor." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107 (D.C. Cir. 2015). Even if such language was sufficient in 2013 and 2014, when MGT still retained some of its core online gaming business, it was insufficient during the Class Period, by which time MGT was no longer an operating company.

Furthermore, during the Class Period, MGT never met the NYSE's definition of an "operating company." Accordingly, any cautionary language was not exculpatory, because it was couched as a possible future event and did not warn that MGT **currently** failed to meet listing requirements. *See In re MF Global Holdings Ltd. Sec. Litig*., 982 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013) ("[c]autionary language that is misleading in light of historical fact cannot be meaningful").

### E.  The Fact that NYSE Listing Requirements are Publicly Available Does Not Negate Defendants' Duty to Disclose the Risks of Delisting

Defendants' argument that it did not need to disclose the true risks of delisting because the Exchange's listing standards are "publicly available," Defs.' Br. at 20, is unavailing. The Second Circuit has repeatedly opined that the public availability of information does not necessarily obviate a company's duty to inform investors of that information. "While the 'total mix' of information relevant to the question of materiality can include publicly available information, 'case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *New Jersey Carpenters Heath Fund v. Royal Bank of Scotland Group, PLC*, 709 F.3d 109, 127 (2d Cir. 2014) (quoting *Litwin v. Blackstone Group, L.P.,* 634 F.3d 706, 718 (2d Cir. 2011). Courts have frequently found a duty to inform investors of material information that was technically publicly available. *See New Jersey Carpenters*, 709 F.3d at 127 (Second Circuit reversed dismissal, finding duty to disclose information even though such information was in part contained in NEW YORK TIMES and FORBES articles); *Litwin*, 634 F.3d at 718-19 (Second Circuit reversed dismissal, finding duty to disclose information even though that was in part contained in news articles and analyst calls, as well as publicly revealed shifts in business strategy and loss of an exclusive contract); *In re MetLife Demutualization Litig.*, 156 F. Supp. 2d 254, 268-69 (E.D.N.Y. 2001) (upholding claim

that defendants failed to inform policyholders that a proposed demutualization would make contested elections more costly because, even though "the costs and procedures for contesting elections…is set forth in the New York insurance law," "it cannot be said as a matter of law that a reasonable policyholder would have been able to make the appropriate inference … from the facts disclosed"); *Alpha Capital Anstalt v. New Generation Biofuels, Inc*., No. 13-CV-5586 (VEC), 2014 WL 6466994, at *11, 2014 U.S. Dist. LEXIS 161472, at *28 (S.D.N.Y. Nov. 18, 2014) (duty to disclose Foreign Patent Reports even though they "were accessible through the internet"); *Meyer v. Concordia International Corp.,* No. 16 Civ. 6467 (RMB), 2017 WL 5083603, at *5-6 , 2017 U.S. Dist. LEXIS 119436, at *15-16 (S.D.N.Y. July 28, 2017) (duty to disclose pharmaceutical company's formulary changes, even though such formulary information was technically publicly available).[10] Moreover*,* the "truth-on-the-market defense is intensely fact-specific, so courts rarely dismiss a complaint on this basis." *Mendell v. Amgen, Inc. (In re Amgen Inc. Sec. Litig.)*, 544 F. Supp. 2d 1009, 1025 (C.D. Cal. 2008).[11]

---

[10] The cases cited by Defendants are inapposite. In *Siebert v. Sperry Rand Corp*., 586 F.2d 949, 952 (2d Cir. 1978), the company's "labor difficulties were matters of general public knowledge" and were "reported countrywide in the press and on radio and television, were discussed in Congress, were analyzed in published administrative and judicial opinions" while "a nationwide consumer boycott was being conducted against [the company], accompanied by massive media advertising." Moreover, the court reached its conclusion based on a full summary-judgment record, not on a motion to dismiss. Here, by contrast, the provisions of the NYSE Company Guide were not publicly disseminated to the same extent. In *Heliotrope Gen. Inc. v. Ford. Motor. Co*., 189 F.3d 971, 979 n.10 (9th Cir. 1999), the *plaintiff's own expert* testified that the relevant tax code provisions "were part of the publicly available information incorporated into the stock price." Here, at the pleading stage, there are no such similar admissions about the incorporation of the Exchange rules into the stock price. And in *Propane, Inc. v. Tenexco, Inc*., 844 F.2d 1317, 1323-34 (7th Cir. 1988), the allegedly undisclosed public information was not material and "cannot have caused the buyers any loss"—unlike here.

[11] *See also Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 289-90 (S.D.N.Y. 2004) (upholding claim where "Banks did not conceal any facts" but did "manipulate these objective facts by misstating the Banks' true opinions of the impact of these events"); *Jefferson Ins. Co. v.*

Here, while the NYSE MKT Company Guide is technically available on the NYSE's website, these regulations are not within the "public mix" of information. Furthermore, Defendants themselves affirmatively discussed how MGT was faring on listing compliance in regards to its market capitalization, stockholders' equity and per share selling price, with specific references to the Exchange's listing standards. Given that Defendants believed that certain provisions of the NYSE Company Guide needed to be disclosed to investors, they cannot plausibly assert that other relevant provisions did not need to be disclosed due to those provisions' public availability.

### F. Plaintiffs Have Adequately Pled Scienter

While Defendants have not contested the issue of scienter, Plaintiffs have nonetheless pled it adequately. Here, the facts alleged create a strong inference of the Defendants' actual knowledge and recklessness,[12] as they have pled that Defendants made misstatements when they knew or should have known their falsity. CAC ¶¶ 53, 60, 63, 68, 84, 86, 88, 90, 92.

---

*Rouhana (In re Winstar Communs.)*, Nos. 01 CV 3014 (GBD), 01 CV 11522, 2006 U.S. Dist. LEXIS 7618, at *48 (S.D.N.Y. Feb. 24, 2006) (analyst's purported ability to conclude from "an examination of the publicly reported financials" that defendant "had insufficient cash flow to fund its operations" did "not mean that a reasonable investor could have drawn those same conclusions based on the total mix of the available information").

[12] Under the PSLRA, in order to adequately plead scienter, a plaintiff must allege facts that, when viewed holistically, give rise to a strong inference that the defendant acted with "the required state of mind." 15 U.S.C. §78u-4(b)(2). A plaintiff pleads a strong inference of recklessness "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Examples of such circumstantial evidence of misconduct include allegations that defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . or . . . failed to check information they had a duty to monitor." *In re Bear Stearns Sec., Deriv. and ERISA Litig.*, 763 F. Supp. 2d 423, 486 (S.D.N.Y. 2011) (quoting *Novak*, 216 F.3d at 311). "An egregious refusal to see the obvious" is a hallmark of recklessness. *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F. 3d 36, 40 (2d Cir. 2000).

Similarly, scienter may be pled by demonstrating motive and opportunity. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006). Here, both Defendant McAfee and Defendant Ladd had the requisite motive and opportunity to make misrepresentations.

Defendant McAfee had motives not aligned with the interests of shareholders, For example, under the terms of a consulting agreement between MGT and Future Tense (a startup incubator founded by McAfee, and 33% owned by McAfee's wife) entered into on May 9, 2016 concerning D-Vasive, Future Tense would receive Future Tense was to receive $250,000, plus a $250,000 cash bonus if MGT's stock price exceeded $1 for ten consecutive days, plus an additional $350,000 if MGT's stock price exceeded $2 for ten consecutive days. Both of these milestones were met during 2016—and as the 2016 10-K confirms, MGT paid Future Tense $902,000 in consulting fees. This money would we paid to Future Tense regardless if the D-Vasive transaction was consummated. This gave McAfee the motive to artificially prop up the stock price for a short period of time, even if there was a risk that the D-Vasive transaction would not be consummated. CAC ¶ 107. Furthermore, McAfee used the company as a way to raise his public profile, improve his reputation, and deflect negative publicity. CAC ¶¶ 108-10.

Defendant Ladd also had motives not aligned with the interests of shareholders. During the Class Period, Defendant Ladd took advantage of the inflated MGT stock price to sell a total of $468,828 in MGT stock. CAC ¶¶ 111. Thus, the timing and magnitude of the sales is "unusual" and "suspicious." *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009). Further, Defendant Ladd took advantage of MGT's inflated stock price to renegotiate favorable employment and compensation terms. CAC ¶¶ 112.

### G.  Plaintiffs Have Adequately Pled Loss Causation

While Defendants have not contested the issue of loss causation, Plaintiffs have nonetheless pled it adequately. Loss causation is subject to the notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2). *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010). A "short and plain statement" that provides notice of a "causal connection" between the material misrepresentation and the loss is sufficient. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346-47 (2005). This causal connection can be alleged as a market reaction to a corrective disclosure, or a foreseeable loss caused by the materialization of a concealed risk. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (citing *In re Omnicom Grp., Inc. Sec. Litig.,* 597 F.3d 501, 511, 513 (2d Cir. 2010)). Here, Plaintiff pleads facts sufficient to meet this low bar by pleading that Defendants' misrepresentations caused the stock price to rise, CAC ¶¶ 51, 59, and, when the truth was finally revealed, the news caused the stock price to drop. CAC ¶¶ 94, 96, 99.

### H.  Plaintiffs Adequately Pled Control Person Liability against Defendant McAfee

Because Plaintiff has alleged a primary violation of §10(b), Plaintiff also states a "control person" claim under §20(a). Plaintiff has adequately alleged control through the Individual Defendants' involvement in the dissemination of the misstatements at issue, through their significant roles and the company and control of the public statement and SEC filings. CAC ¶¶ 15, 16, 53, 56 60.[13] Plaintiff also adequately alleged culpable participation by alleging scienter. *Id*. Since these elements are subject to the notice pleading requirements of Rule 8(a)(2), these

---

[13] Plaintiffs must show that (1) the individual defendant "possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise" and (2) the defendant had "actual control over the transaction in question." *In re Global Crossing Ltd. Sec. Litig*., No. 02 Civ. 910, 2005 WL 1875445, at *3, 2005 U.S. Dist. LEXIS 16232, at *9 (S.D.N.Y. Aug. 5, 2005).

allegations are sufficient. *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, No. 11 Civ. 3658, 2012 WL 2512280, at *9, 2012 U.S. Dist. LEXIS 91004, at *44 (S.D.N.Y. June 29, 2012).

Defendants argue that John McAfee was not a "control person" because he did not formally become Chairman and CEO until he was formally approved by MGT's board on November 18, 2016. (Defs.' Br. at 24-25.) But this assertion of lack of requisite control over MGT is belied by the clear facts here. The "proposed appointment" of McAfee was announced at the start of the Class Period, at the same time as MGT's announcement that it would change its name to John McAfee Global Technologies, Inc. CAC ¶ 46. McAfee himself assured stockholders that he would not be just a figurehead, stating on May 26, 2016 that "MGT will be the vehicle I use to create wealth for all stockholders." CAC ¶ 56. Accordingly, Defendants' own affirmative statements indicate that McAfee indeed had sufficient control over MGT, the company that proposed to bear his name.

## IV.   CONCLUSION

For all the above reasons, Defendants' Motion should be denied in its entirety.

Dated: October 13, 2017                    Respectfully submitted,

                                           **POMERANTZ LLP**

                                           */s/ Murielle J. Steven Walsh*
                                           Jeremy A. Lieberman
                                           Murielle J. Steven Walsh
                                           Aatif Iqbal
                                           600 Third Avenue, Floor 20
                                           New York, New York 10016
                                           Phone: 212-661-1100
                                           Fax: 917-463-1044
                                           jalieberman@pomlaw.com
                                           mjsteven@pomlaw.com
                                           aiqbal@pomlaw.com

                                           ***Lead Counsel for Plaintiffs***

**GLANCY PRONGAY & MURRAY LLP**
Brian P. Murray (BM 9954)
Gregory B. Linkh (GL 0477)
230 Park Avenue, Suite 530
New York, New York 10169
Tel: (212) 682-5340
Email: bmurray@glancylaw.com
        glinkh@glancylaw.com

*Additional Counsel for Plaintiffs*