UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

IN RE: MGT CAPITAL INVESTMENTS,          **MEMORANDUM AND ORDER**
INC. SECURITIES LITIGATION,
                                           16 Civ. 7415 (NRB)
----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


## I.   <u>INTRODUCTION</u>

This federal securities class action was filed on behalf of
all persons who purchased or otherwise acquired the securities
of defendant MGT Capital Investments, Inc. ("MGT" or the
"Company") between May 9, 2016 and October 19, 2016, inclusive
(the "Class Period").  Plaintiffs[1] alleged that MGT and two
individual defendants, Robert B. Ladd and John McAfee, violated
Section 10(b) of the Securities Exchange Act of 1934 (the
"Exchange Act") and Rule 10b-5 promulgated thereunder, and that
Mr. Ladd and Mr. McAfee violated Section 20(a) of the Exchange
Act.  Defendants filed a motion to dismiss pursuant to Federal
Rule of Civil Procedure 12(b)(6).  Because plaintiffs failed to
plead any material misrepresentation or omission by the
defendants, this motion is granted.

---

[1]     On April 11, 2017, the Court appointed Danny T. Nguyen and Song Suh as
lead plaintiffs and approved their selection of Pomerantz LLP as lead
counsel.  ECF No. 28.

## II.  BACKGROUND

The following allegations are drawn from plaintiffs' amended complaint ("AC") (ECF No. 36), and are assumed to be true for the purposes of this motion.  See Global Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 154 (2d Cir. 2006).  We also consider any statements or documents incorporated into the AC by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"),[2] and documents upon which plaintiffs relied in bringing this action.[3]  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

---

[2]     Of particular relevance to this motion are:  (1) MGT's Form 10-Q for the quarterly period ending June 30, 2015, filed with the SEC on August 14, 2015 ("2Q 2015 10-Q"); (2) MGT's Form 8-K, filed with the SEC on September 10, 2015, ECF No. 42-5 ("9/10/15 8-K"); (3) MGT's Form 10-K for the fiscal year ended December 31, 2015, filed with the SEC on April 41, 2016, ECF No. 42-4 ("2015 10-K"); (4) MGT's Form 8-K, filed with the SEC on May 9, 2016, ECF No. 42-6 ("5/9/16 8-K"); (5) MGT's Form 10-Q for the quarterly period ending March 31, 2016, filed with the SEC on May 23, 2016 ("1Q 2016 10-Q"); (6) MGT's Form 8-K, filed with the SEC on May 26, 2016, ECF No. 42-7 ("5/26/16 8-K"); (7) MGT's Schedule 14A, filed with the SEC on July 11, 2016, ECF No. 42-10 ("First Preliminary Proxy Statement"); (8) MGT's Schedule 14A, filed with the SEC on August 8, 2016, ECF No. 42-11 ("Second Preliminary Proxy Statement"); (9) MGT's Schedule 14A, filed with the SEC on August 15, 2016, ECF No. 42-12 ("Definitive Proxy Statement" and, together with the First Preliminary Proxy Statement and Second Preliminary Proxy Statement, the "Proxy Statements"); (10) MGT's Form 10-Q for the quarterly period ending June 30, 2016, filed with the SEC on August 15, 2016 ("2Q 2016 10-Q"); (11) MGT's Form 8-K, filed with the SEC on September 20, 2016, ECF No. 42-14 ("9/20/16 8-K); and (12) MGT's Form 10-K for the fiscal year ended December 31, 2016, file with the SEC on April 20, 2017 ("2016 10-K").

[3]     In particular, plaintiffs relied upon several of defendants' press releases in the AC, including:  (1) MGT's press release entitled "MGT to File Proxy for the Upcoming Meeting of Shareholders by June 30th," issued June 23, 2016, quoted in AC ¶ 83, ECF No. 42-8 ("6/23/16 Press Release"); and (2) MGT's press release entitled "MGT Answers Stockholder Questions on Proxy Statement," issued July 11, 2016, quoted in AC ¶ 89, ECF No. 42-18 ("7/11/16 Press Release").

A.    **Factual Background**

1.    **MGT and Its Predecessors**

MGT has changed names and business strategies several times, but has consistently "incurred significant operating losses since inception."  AC ¶¶ 18, 34, 66; 2016 10-K, p. 7; 2015 10-K, p. 9. The predecessor company to MGT was originally incorporated in Utah in 1977.  AC ¶ 14.  In 2000, it was reincorporated in Delaware as HTTP Technology, Inc. ("HTTP") and went public.  AC ¶¶ 14, 18.  At the time, HTTP focused on "strategic acquisitions in Internet and Internet-related businesses."  AC ¶ 19.  The Company changed its name to Medicsight, Inc. in 2002 and began to focus on medical imaging technology, specifically the computer-aided detection of health problems.  AC ¶¶ 19, 22.  In 2005, the Company's common stock was first listed on the American Stock Exchange, which at all times relevant to this motion was known as the NYSE MKT (the "Exchange").  AC ¶ 14.  In 2007, while still operating in the medical imaging business, the company adopted its current name, MGT Capital Investments, Inc.  AC ¶ 19.

Defendant Robert B. Ladd joined MGT in December 2010 as a director, became Interim President and CEO in February 2011, and then President and CEO in January 2012.  AC ¶¶ 15, 23.  Ladd encountered a number of problems early in his tenure with the company.  First, in 2011 and 2012, MGT received notices from the Exchange that it was not in compliance with Exchange rules and

3

therefore risked being delisted.  AC ¶¶ 21, 72.  MGT worked with the Exchange to resolve these issues and did so by effectuating a reverse stock split in March 2012.  AC ¶ 21.  Second, in July 2011, the CEO of Medicsight, MGT's largest and most important subsidiary at the time, resigned due to improprieties concerning undisclosed related-party transactions.  AC ¶ 22.

Under Ladd's direction, the Company pivoted to a strategy of "acquiring, developing, and monetizing assets in the online and mobile gaming space as well as the social casino industry."  AC ¶ 23.  However, the Company's net losses continued to grow while its revenues shrank:  in 2013, it had a net loss of $10.2 million with revenue of only $396,000.  AC ¶ 24.

### 2.   DraftDay

In April 2014, MGT acquired DraftDay, a fantasy sports business and software platform for $600,000 in cash and 100,000 shares of common stock.  AC ¶ 25.  DraftDay quickly became the most successful of MGT's subsidiaries:  it generated gross margin of $353,000 on revenue of $963,000 in 2014, and gross margin of $415,000 on revenue of $640,000 in 2015.  AC ¶ 26.  MGT's CFO at the time, Robert Traversa, described DraftDay as the Company's "crown jewel in our portfolio of assets," and the Company attributed its increase in revenues in 2014 to DraftDay.  AC ¶¶ 25, 26.

Despite DraftDay's success, MGT's operating expenses remained high, and the Company suffered from serious liquidity problems. AC ¶¶ 27, 29.   MGT's stock price dropped from a high of $2.91 at the beginning of 2014 to $0.63 by the end of the year.   AC ¶ 28. In the first two quarters of 2015, MGT had a net loss of $2.122 million, and was left with only $1.097 million of cash and cash equivalents.   2Q 2015 10-Q, p. 7.   MGT indicated in its Form 10-Q for the second quarter of 2015 that it had "substantial doubt about the Company's ability to continue as a going concern."   AC ¶ 27; 2Q 2015 10-Q, p. 7.

Facing this "pending liquidity crisis," MGT sold DraftDay for approximately $5.5 million in September 2015.  AC ¶ 30.  The sale "materially reduce[d] the Company's ongoing burn rate," but its cash flow remained negative.   AC ¶ 30.   On October 8, 2015, MGT raised an additional $700,000 by entering into subscription agreements with a group of accredited investors led by Barry Honig in exchange for 2.8 million shares of MGT common stock and options to buy 5.6 million additional shares, but the company's liquidity problems remained.   AC ¶ 31-32.

MGT reported in its 2015 Form 10-K that it had only $359,000 in cash and cash equivalents, with negative cash flow of $2.4 million, only $104,000 in revenue from continuing operations ($102,000 of which derived primarily from a "non-recurring gaming patent licensing fee"), and an accumulated deficit of

$303,944,000.  AC ¶ 33; 2015 10-K.  At the time, MGT had only two employees; the CFO had left the Company, so Mr. Ladd was serving as both CEO and Interim CFO.  AC ¶ 33 & n.5; 2015 10-K, p. 24.

In MGT's 2015 Form 10-K, Friedman LLP, the Company's auditor, observed that the Company "had incurred significant operating losses since inception and continues to generate losses from operations," which raised "substantial doubt about the Company's ability to continue as a going concern."  AC ¶ 34.  After selling DraftDay, MGT's strategy was uncertain, and MGT reported that it was "considering all methods to create value for shareholders, including potential mergers, spin-offs, distributions and other strategic actions."  AC ¶ 35; 2015 10-K, p. 2.

By March 31, 2016, MGT had only $189,000 in cash and cash equivalents, and in the second quarter of 2016, MGT reported a net loss of $7.4 million.  AC ¶¶ 44, 67.  The situation did not appear to be improving, as MGT had zero revenue for the first six months of 2016.  AC ¶¶ 44, 67.

### 3.   The Arrival of John McAfee and the D-Vasive Transaction

Defendant John McAfee first heard of MGT in March 2016.[4]  AC ¶ 42.  In April 2016, Mr. McAfee met with Mr. Ladd, the CEO of MGT

---

[4]    Plaintiffs spend several pages of their complaint discussing Mr. McAfee's purportedly checkered past before joining MGT.  AC ¶¶ 37-41.  In short, plaintiffs allege that after founding a successful antivirus software company that bears his name, Mr. McAfee lost a $100 million fortune during the financial crisis and "built a heavily armed compound in the jungle" in Belize.  AC ¶¶ 37-38; see GRINGO: THE DANGEROUS LIFE OF JOHN MCAFEE (Showtime

at the time, and John O'Rourke, the managing member of ATG Capital LLC, which had provided MGT with $700,000 of equity capital on October 8, 2015.  AC ¶ 42.  At this meeting, Mr. McAfee, Mr. Ladd, and Mr. O'Rourke agreed that MGT would be rebranded as a cybersecurity company led by Mr. McAfee.  AC ¶ 43.  To start, MGT planned to acquire D-Vasive, an anti-spyware technology being developed for mobile devices that would protect users from invasive apps that seek access to personal contacts, cameras, and other information.  AC ¶ 43; 5/9/16 8-K.

On May 9, 2016, MGT issued a press release announcing its plans to acquire D-Vasive, its consulting agreement with Future Tense, and the proposed appointment of Mr. McAfee as Executive Chairman and CEO, stating in relevant part:

> **John McAfee Returns to Public Markets as MGT Capital Agrees to Acquire Security/Privacy Technology**
>
> *Mr. McAfee to be Chairman and CEO of renamed John McAfee Global Technologies*
>
> MGT Capital Investments, Inc. (NYSE MKT: MGT) announced today that it has entered into a definitive asset purchase agreement to acquire certain technology and assets from D-Vasive Inc., a provider of leading edge anti-spy software.  D-Vasive offers a powerful tool for protection from the proliferation of invasive apps by consumer products companies, social networks, financial

---

Networks 2016); Jon Swartz, "John McAfee Prepares for His 'Last Stand,'" USA TODAY (Feb. 10, 2015, 4:43 p.m.) https://www.usatoday.com/ story/tech/2015/02/10/john-mcafee-tennessee-security-legend-futuretense-alabama/21712017/.  Mr. McAfee then created a startup incubator called Future Tense Central in November 2013, where he oversaw and mentored approximately ten start-up technology companies, including D-Vasive Inc. ("D-Vasive") and Demonsaw LLC ("Demonsaw"), both of which MGT would later seek to acquire.  AC ¶¶ 39-41.

institutions and others.     These invasive apps can secretly turn on a phone's microphone and camera, as well as monitor geographic movements and access contacts.     The D-Vasive technology operates in a unique way, allowing the user to manage and control the device's internal hardware.     D-Vasive will be available shortly for Android and Windows platforms, followed by a release for Apple iOS.

In conjunction with the acquisition, MGT is pleased to announce the proposed appointment of John McAfee as Executive Chairman and Chief Executive Officer.     Mr. McAfee, the visionary pioneer of internet security, sold his anti-virus company to Intel for $7.6 billion, and is actively involved in the development of new measures to protect individual freedoms and privacy.     Mr. McAfee stated, "The enormous impact of cybersecurity on our lives requires the scale and resources of a public company.     Our ability to continue to hire the best minds in the business will be vastly enhanced with a public platform.     With the acquisition of D-Vasive technology as a starting point, we expect to grow MGT into a successful and major force in the space."     MGT Capital also intends to change its corporate name to John McAfee Global Technologies.

AC ¶ 46.

That same day, MGT filed a Form 8-K with the SEC announcing that it had entered into an Asset Purchase Agreement for the purchase of certain technology and assets from D-Vasive, including its apps for mobile devices and its intellectual property ("D-Vasive APA").  5/9/16 8-K, pp. 1, 11.  In return, MGT would provide D-Vasive with: (1) $300,000 in cash at the date of closing; (2) 4,760,000 unregistered shares of common stock to be held in escrow pending satisfaction of the representations and warranties in the APA; and (3) 19,040,000 unregistered shares of common stock at the date of closing.  Id. at 12.  MGT announced that the 23,800,000

8

total unregistered shares included in the purchase price represented "roughly 47% of the Company on a pro-forma fully diluted basis at closing." Id. at EX-99.1. The closing of the D-Vasive APA was contingent on the satisfaction of a number of conditions, including approval by MGT's shareholders and "all approvals, waivers and consents" from "each Governmental Authority, including NYSE MKT." Id. at 13.

MGT's stock shot upwards in the days after it publicly announced the arrival of Mr. McAfee and the acquisition of D-Vasive[5]: From May 6, 2016 to May 17, 2016, MGT's stock price went from $0.36 to $4.15. AC ¶ 51.

### 4.   The Demonsaw Transaction

On May 26, 2016, MGT announced its plan to acquire a second company in the cybersecurity sector, Demonsaw LLC ("Demonsaw"), a secure and anonymous file sharing software platform. AC ¶ 56. That same day, MGT filed a Form 8-K with the asset purchase agreement ("Demonsaw APA") attached. 5/26/16 8-K. Under the terms of the Demonsaw APA, Demonsaw's shareholders would receive 20 million restricted shares of MGT common stock, which required MGT to issue new shares that were expected to amount to approximately 28% of the Company's common stock on a pro-forma fully diluted

---

[5]     Plaintiffs allege that these gains may have been fueled by Mr. McAfee's tweets and Facebook posts promoting MGT, as well as a $125,000 promotional campaign by "professional stock promoter StockBeast." AC ¶ 50.

9

basis at closing, inclusive of the shares to be issued in connection with the D-Vasive acquisition. AC ¶ 57. The closing of the Demonsaw transaction was contingent on several conditions, including approval by MGT's stockholders, necessary approvals from the NYSE MKT, and the prior closing of the D-Vasive transaction. 5/26/16 8-K.

MGT's May 26, 2016 Form 8-K also included a press release announcing the Demonsaw transaction and MGT's plan to appoint Demonsaw's founder, Eric J. Anderson (also known as Eijah), as its Chief Technology Officer. AC ¶ 56. The press release includes the following quote from Mr. McAfee: "I want to reiterate my personal commitment towards the creation of a major force in cybersecurity. As a listed company with proper corporate governance and regulatory standards, MGT will be the vehicle I use to create wealth for all stockholders." AC ¶ 56.

Despite the announcements of the proposed D-Vasive and Demonsaw transactions, cybersecurity was not yet an operational segment of MGT's business in 2016; the Company listed zero revenue from any cybersecurity business that year. [6] AC ¶¶ 68-70. Indeed, MGT warned shareholders in its 2016 Form 10-K that "[t]here is no assurance that we will be successful in commercializing our cybersecurity products," and that its "current and currently

---

[6] MGT's only revenues from continuing operations in 2016 were $313,000 in bitcoin mining. AC ¶ 70.

proposed cybersecurity products are in the initial stages of commercialization."  AC ¶ 68; 2016 10-K, p. 10.

### 5.   MGT's 2016 Public Statements

The D-Vasive and Demonsaw transactions both required the approval of MGT's shareholders, as did the appointment of Mr. McAfee as CEO and Executive Chairman of the Board.  Plaintiffs assert that MGT made several materially false and misleading press releases and publicly filed documents in connection with its proxy statements in advance of this shareholder vote.

On June 23, 2016, MGT issued a press release announcing that it expected to file a preliminary proxy statement that would "provide information to stockholders for voting upon the Company's announced acquisitions of D-Vasive and Demonsaw, as well as the election of John McAfee as Executive Chairman of the Board and CEO, along with other proposals."  AC ¶ 83.  The press release stated, in part:

> McAfee concluded, "Although I am personally not known for my patience, current management and the proposed leadership teams are committed to the highest standards of transparency and corporate governance as we prepare for the future of this Company.  A transaction of this size and type by a publicly listed company requires great attention to detail by our attorneys and accountants. We have also held preliminary discussions with Exchange officials regarding qualifying for NASDAQ or up listing to the 'main board' of the New York Stock Exchange from NYSE MKT."

Id.

11

On July 8, 2016, MGT issued a press release announcing the filing of the Preliminary Proxy Statement:

> The Proxy includes information for stockholders to vote on the proposed issuance of shares to consummate the announced acquisitions of assets from D-Vasive, Inc. and Demonsaw LLC.  In order to simplify these transactions, and meet certain customary tax issues, the two acquisitions have been effectively combined into one. This new structure was accomplished by D-Vasive purchasing Demonsaw, with MGT buying the combined company pending stockholder approval.  MGT will acquire the same agreed-upon assets and the sellers will have received the same agreed-upon consideration.  The total number of MGT common shares to be issued to D-Vasive is 43,800,000 (equaling the earlier 23,800,000 for D-Vasive and 20,000,000 for Demonsaw).

> Stockholders will also vote on the election of John McAfee as Executive Chairman of the Board, the Company's name change to "John McAfee Global Technologies, Inc.", along with other proposals.  Subject to SEC review, and mandatory notice requirements, MGT's shareholder meeting is still expected to occur in August 2016.

> John McAfee, MGT's proposed Executive Chairman and Chief Executive Officer, stated, "We are pleased to file the proxy for the upcoming shareholder meeting, at which our shareholders will vote on various proposals to implement the previously announced strategic shift in MGT's business.  We are excited to move a step closer towards positioning the Company to address various cyber threats through advanced protection technologies for enterprise and personal tech devices."

AC ¶ 85.

On July 11, 2016, MGT's Board of Directors issued a preliminary proxy statement that stated:  "As a result of the APA, we will have acquired 100% of the common stock of D-Vasive and consequently, control of the business and operations of D-Vasive."

AC ¶ 87(a).  It then discussed MGT's compliance with the NYSE MKT

continued listing requirements:

> Our Common Stock is currently listed on the NYSE MKT, and the NYSE MKT has certain continued listing standards under which it gives consideration to market capitalization, stockholders' equity and per share selling price.  We believe that being listed on the NYSE MKT helps support and maintain liquidity of the Common Stock and company recognition and that the Reverse Stock Split at the new proposed ratio of not less than one-for-2 will increase our ability to continue to meet the continued listing standards of the NYSE MKT.

AC ¶ 87(b).  MGT's Board of Directors repeated identical statements

in the Company's August 8, 2016 Second Preliminary Proxy Statement

and August 15, 2016 Definitive Proxy Statement.  AC ¶ 87.

MGT issued a press release to accompany the First Preliminary

Proxy Statement that stated:

> We have received many thoughtful questions from investors and prospective investors about the process and proposals contained in the Proxy Statement.  As a public company, we take very seriously our responsibility for accurate and full disclosure.  This press release will address several of the most frequently asked questions.
> ***
> MGT stock traded for about $0.25 prior to the public disclosure of the DVasive acquisition and the new relationship with John McAfee.  Following the market's re-valuation to reflect that deal, the Company announced the terms of the Demonsaw deal, and the stock continued to trade at similar levels.  The point here is that MGT's board didn't just wake up to a higher stock price and then decide to issue shares; the very transactions that improved its outlook require this issuance of stock; and the transactions were entirely and fully disclosed at that time.
> ***
> To clarify, MGT Capital Investments, Inc. as a company presently listed on NYSE MKT (or NYSE or NASDAQ if we

13

up-list) cannot issue any shares without board or stock exchange approval.  Further, with limited exceptions (relating to publicly offered sales of stock at a price higher than market price and stock splits), if the issuance exceeds 20% of the outstanding stock at the time, stockholder approval is required. Moreover, stock and stock options issued to executives must be part of an incentive plan having received prior stockholder approval.  Please do not confuse a nationally listed security like MGT with "over-the-counter" or "bulletin board" stocks.  Corporate governance standards are very strict for listed companies.
                              ***
We expect to utilize a reverse split only if required to meet initial listing requirements of the New York Stock Exchange (NYSE) or NASDAQ.  The NYSE (not the NYSE MKT, where MGT is currently traded) has a minimum share price standard of $5.00 for a new listing. (Already listed stocks need to maintain a per share value $1.00 to avoid de-listing).

AC ¶ 89.

On July 15, 2016, MGT announced its development of Sentinel MGT, "an intrusion monitoring system designed to protect corporate and enterprise intranets from sophisticated hacking threats."  AC ¶ 91.  The press release stated:  "Sentinel MGT joins the other technologies acquired by MGT – D-Vasive, Demonsaw and E-Tagged – to make MGT the only company developing targeted solutions for all of these threats to both the consumer and enterprise markets. These technologies, taken together, comprise the world's first comprehensive Anti-Hacking system."  AC ¶ 91.

    6.    **SEC Investigation and Delisting from the NYSE MKT**

        a)    SEC Subpoena

14

On September 15, 2016, MGT received a subpoena from the SEC requesting "certain information from the Company." AC ¶ 93. Four days later, MGT issued a pre-market press release announcing the receipt of the subpoena and stating that MGT had no reason to believe that the Company was or would be the subject of any enforcement proceedings and that it was fully cooperating with the SEC's request. Id. The press release did not provide any further information about the nature of the SEC's requests. The day MGT issued this press release, September 19, 2016, its stock fell $0.74 to $2.52. AC ¶ 94.

> b) NYSE MKT Blocks the D-Vasive and Demonsaw Transactions

On September 20, 2016, MGT announced that the NYSE had informed the company the previous day that it would "not approve the listing on the Exchange of the 43.8 million shares that the Company is required to issue in order to complete the closing of the D-Vassive [sic] merger." AC ¶ 95. MGT explained:

> The New York Stock Exchange is not allowing us to issue shares to the sellers of D-Vasive. However, MGT still has fully proper and legal options to consummate the merger away from the NYSE. To be clear, their decision was not related to any securities regulations, but rather the NYSE's own internal rulings.
>
> The acquisitions have been approved by shareholders, the MGT board, and corporate officers. Considering this support for the acquisitions, MGT has stated unequivocally that it will still pursue closing the acquisition of D-Vasive, a provider of leading edge anti-spy software, and Demonsaw, a provider of a secure and anonymous file sharing software platform. Both

> products are critical to the success of MGT, and without which we cannot proceed with our Company's vision.
>
> Most importantly, Mr. McAfee and Mr. Anderson are fully committed to going forward and building our Company as Chief Executive Officer and Chief Technology Officer, respectively.

AC ¶ 95.  The day MGT announced this news, MGT's stock fell $0.63 to close at $1.89.  AC ¶ 96.

c)   <u>NYSE MKT Delisting Standards</u>

The NYSE MKT's policies for suspending and delisting a security trading on the Exchange are enumerated in the NYSE MKT Company Guide ("CG").  <u>See</u> ECF No. 42-17.  In reaching a decision on whether to delist a security, the NYSE MKT may take many factors into account, including "the degree of investor interest in the company, its prospects for growth, the reputation of its management, the degree of commercial acceptance of its products, and whether its securities have suitable characteristics for auction market trading."  CG § 1001.  NYSE MKT's decision to delist or suspend a security is discretionary:  "The Rules of the Exchange provides that the Board of Directors may, in its discretion, at any time, and without notice, suspend dealings in, or may remove any security from, listing or unlisted trading privileges."  CG § 1002.

The Exchange also lists several criteria "under which it will normally give consideration" in deciding whether to delist a security.  CG § 1003.  Among these are standards regarding total

16

stockholders' equity (CG § 1003(b)), market capitalization (CG § 1003(a)), and per-share selling price (CG § 1003(f)(v)). The Exchange will also "normally consider suspending dealings in, or removing from the list, securities of an issuer . . . [i]f the issuer has sold or otherwise disposed of its principal operating assets or has ceased to be an operating company." CG § 1003(c); see also CG § 1002(c) ("The Exchange, as a matter of policy, will consider the suspension of trading in, or removal from listing or unlisted trading of, any security when, in the opinion of the Exchange . . . the issuer has sold or otherwise disposed of its principal operating asserts, or has ceased to be an operating company."). The Company Guide lists several events that may cause it to review a continued listing, including "the sale . . . of a substantial portion of its business," and "any developments which substantially reduce the size of a company, [or] the nature and scope of its operations." CG § 1001.

### d)    MGT's Delisting

On October 19, 2016, more than a year after MGT had sold DraftDay, the NYSE MKT issued a press release stating: "the staff of NYSE Regulation has determined to commence proceedings to delist the common stock of MGT . . . from the Exchange. Trading in the Company's common stock on the NYSE MKT will be suspended immediately." AC ¶ 97. The press release indicated that the NYSE MKT had "commenced delisting proceedings pursuant to Section

17

1002(c) of the NYSE MKT Company Guide that applies when a company has sold or otherwise disposed of its principal operating assets, or has ceased to be an operating company." AC ¶ 97.

The next day, MGT issued a press release stating that it was considering appealing the NYSE MKT's decision, but that MGT's common stock would begin trading over the counter under the symbol "MGTI." AC ¶ 98. On October 21, 2016, the stock closed at $1.29, down 45% from MGT's close of $2.35 on October 19, 2016. AC ¶ 99. MGT initially made public statements opposing the NYSE MKT's decision, but eventually announced that it would not appeal its delisting. AC ¶¶ 100-02.

**B.    Procedural History**

The initial complaint in this action was filed on September 22, 2016 (after the NYSE MKT blocked the D-Vasive and Demonsaw Transactions, but before MGT had been delisted), and early notice was published the same day on Globe Newswire to all putative class members in accordance with 15 U.S.C. § 78u-4(a)(3)(A)(i). Compl., ECF No. 1. On April 11, 2017, the Court appointed Danny T. Nguyen and Song Suh as lead plaintiffs, approved their selection of Pomerantz LLP as lead counsel, and consolidated three securities class actions filed against MGT under case number 16 Civ. 7415, with the caption In re MGT Capital Investments, Inc. Securities Litigation. Mem. & Order, ECF No. 28.

18

Plaintiffs filed the AC on June 30, 2017, alleging securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against all defendants and control person liability under section 20(a) of the Exchange Act against Mr. Ladd and Mr. McAfee.  AC, ECF No. 36.  Defendants subsequently filed their motion to dismiss on August 29, 2017, arguing that plaintiffs failed to allege any actionable misstatements or omissions and failed to state a control person claim against the individual defendants.  Defs.' Mot. to Dismiss, ECF No. 39; Defs.' Mem. of Law, ECF No. 41.

### C.    MGT's Alleged Misstatements and Omissions

Plaintiffs allege that defendants made four cateogries of misstatements and omissions during the Class Period:    (1) defendants failed to disclose that MGT was at risk of being delisted under CG § 1003(c) (AC ¶¶ 75, 88(b), 90(b)); (2) defendants failed to disclose that the D-Vasive and Demonsaw transactions were unlikely to close because NYSE MKT was unlikely to approve the transactions (AC ¶¶ 53(a), 60(a), 84(a), 86(a), 88(a), 90(a), 92); (3) defendants characterized MGT as a "listed company with proper corporate governance and regulatory standards" that was "committed to the highest standards of transparency and corporate governance" (AC ¶¶ 60(c), 84(c)); and (4) defendants failed to disclose that their actions during the Class Period were likely to cause NYSE MKT to closely scrutinize MGT, discover that

19

MGT was not in compliance with its listing requirements, and delist MGT (AC ¶¶ 53(b), 60(b), 84(b), 86(b), 88(c), 90(c)).  In their opposition brief to defendants' motion to dismiss and at oral argument, plaintiffs focused primarily on the first category.  See Pls. Mem. of Law in Opp'n, ECF No. 43, pp. 1-4, 7-22.

### III. Discussion

#### A.    Legal Standard

##### 1.    Motion to Dismiss

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiffs' favor.  City of Providence v. BATS Global Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017). Nevertheless, plaintiffs' factual allegations must "be enough to raise a right of relief above the speculative level, on the assumption that all of the allegations in the complaint are true." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations omitted).

##### 2.    Securities Fraud Claims under Section 10(b)

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  In order to state a claim under Section

20

10(b) and Rule 10b-5, the plaintiffs must adequately plead the following elements:  "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157 (2008).

Claims under Section 10(b) must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure by "stat[ing] with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); see ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  A complaint alleging securities fraud must also meet the requirements of the Private Securities Litigation Reform Act ("PSLRA"), which requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988).  Omissions are therefore actionable under Section 10(b) only when a corporation has a duty to disclose the omitted facts.

21

Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015).
However, "once a company speaks on an issue or topic, there is a
duty to tell the whole truth, even where there is no existing
independent duty to disclose information on the issue or topic."
In re Vivendi, S.A. Sec. Litig., 838 F. 3d 223, 258 (2d Cir. 2016)
(internal quotation marks omitted); see also Caiola v. Citibank,
N.A., 295 F.3d 312, 331 (2d Cir. 2002) (when a party chooses to
speak on a subject, it has a "duty to be both accurate and
complete").  A company's omission is material, and therefore
actionable under Rule 10b-5, "only if there is a substantial
likelihood that the disclosure of the omitted fact would have been
viewed by the reasonable investor as having significantly altered
the total mix of information made available."  In re Int'l Bus.
Machs. Corp. Sec. Litig., 163 F.3d 102, 106-07 (2d Cir. 1998)
(citing Basic, 485 U.S. at 231-32).

The Second Circuit has "identified several important
limitations on the scope of liability for securities fraud." Novak
v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000).  Two such limitations
are relevant here.  First, plaintiffs may not plead "fraud by
hindsight":   "[A]llegations that defendants should have
anticipated future events and made certain disclosures earlier
than they actually did do not suffice to make out a claim of
securities fraud."  Id.  Second, "as long as the public statements
are consistent with reasonably available data, corporate officials

22

need not present an overly gloomy or cautious picture of current performance and future prospects."  Id.

### B.   Analysis

#### 1.   Section 10(b) and Rule 10b-5

Defendants challenge only the first element of a claim under Section 10(b) and Rule 10b-5, arguing that plaintiffs failed to allege any actionable misstatements or omissions.[7]  Plaintiffs' primary response is that when defendants chose to speak about the NYSE MKT's listing requirements, they had a duty to disclose the risk that MGT would be delisted because it was not an operating company.

Specifically, plaintiffs point to MGT's discussion of the continued listing standards for "market capitalization, stockholders' equity, and per share selling price" in the Proxy Statements.[8]  Plaintiffs allege that when MGT did so, it also had

---

[7]    While plaintiffs argued at length in their motion papers that they had adequately pleaded materiality, scienter, and loss causation, Pls.' Mem of Law in Opp'n, ECF No. 43, pp. 23-25, 29-31, defendants do not challenge any of these elements at this stage, while reserving the right to do so later, Defs.' Reply Mem. of Law, ECF No. 44, p. 5.  Therefore, the Court's analysis here focuses solely on the one element in dispute:  the existence of actionable misrepresentations or omissions.

[8]    The operative language of all three Proxy Statements is identical:

> Compliance with the NYSE MKT Continued Listing Requirements.  Our Common Stock is currently listed on the NYSE MKT, and the NYSE MKT has certain continued listing standards under which it gives consideration to market capitalization, stockholders' equity and per share selling price.  We believe that being listed on the NYSE MKT helps support and maintain liquidity of the Common Stock and company recognition and that the Reverse Stock Split at the new proposed ratio of not less than one-for-2 will increase our ability to continue to meet the continued listing standards of the NYSE MKT.

23

a duty to disclose the specific risk that the Company could be delisted for failure to be an operating company under section 1003(c).    In essence, plaintiffs argue that defendants' disclosures were incomplete because they did not include the actual reason why MGT was delisted.

In context, however, the failure to discuss section 1003(c) in this portion of the Proxy Statements could not have misled any reasonable investor.    The Proxy Statements offered the recommendations of the Board of Directors on various issues that were up for a vote at the Company's 2016 Annual Meeting, including (1) authorizing the issuance of shares necessary for the D-Vasive and Demonsaw transactions, (2) ratifying the employment agreements for Mr. Ladd and Mr. McAfee, and (3) implementing a reverse stock split.    These allegedly misleading statements were made in connection with the latter when the Board of Directors observed that a reverse stock split "could further enhance the appeal" of the stock by increasing the stock price, decreasing the volatility of the stock on a percentage basis, and helping it comply with the NYSE MKT's continued listing requirements, which include the "market capitalization, stockholders' equity, and per share selling price."    First Preliminary Proxy Statement, p. 37; Second

---

First Preliminary Proxy Statement, p. 37; Second Preliminary Proxy Statement, p. 43; Definitive Proxy Statement, p. 43.

Preliminary Proxy Statement, p. 43; Definitive Proxy Statement, p. 43.

In context, these recommendations in favor of a reverse stock split could not reasonably be confused for an analysis of the risks that MGT could be delisted from the NYSE MKT. The language in the Proxy Statements certainly does not imply that these three listing standards were the only ones relevant to the Company's continued listing on the Exchange, and no reasonable investor could have read the Preliminary Proxy Statement as foreclosing the possibility that MGT could be delisted for any other reason, including under 1003(c).

Indeed, it was not unreasonable for the Board of Directors to omit any mention of 1003(c) from this section of the Proxy Statements. These statements were made in a recommendation to vote for a reverse stock split, which serves to reduce the number of a company's shares while increasing the share price proportionally.[9] While a reverse stock split would be expected to have an immediate effect on the Company's per share selling price, it would have none whatsoever on its status as an operating company. Any mention of 1003(c) in this context would have been a non-sequitur.[10]

---

[9]    For example, a stockholder with 10 shares of stock before a 1-for-2 reverse stock split would receive 5 shares after the split.

[10]    The fact that the Proxy Statements also listed market capitalization and stockholders' equity, neither of which would be affected by a reverse stock split, does not change this analysis. Disclosure of certain irrelevant

25

Moreover, MGT made fulsome disclosures both about the miserable financial state of the Company and the possibility that it could be delisted.  MGT disclosed that, by the end of 2015, it had only $359,000 in cash and cash equivalents, with negative cash flow of $2.4 million, only $104,000 in revenue from continuing operations ($102,000 of which derived primarily from a "non-recurring gaming patent licensing fee"), and an accumulated deficit of $303,944,000.  AC ¶ 33.  MGT also disclosed that it had sold DraftDay, its most successful subsidiary, in September 2015.  AC ¶ 30.  MGT's 2015 Form 10-K included a statement from the Company's auditor that it "had incurred significant operating losses since inception and continues to generate losses from operations," which raised "substantial doubt about the Company's ability to continue as a going concern."  AC ¶ 34.  At the end of the first quarter of 2016, MGT reported that it had only $189,000 in cash and cash equivalents, and in the second quarter of 2016, it reported a net loss of $7.4 million.  AC ¶¶ 44, 67.  Over the first six months of 2016, MGT reported that it had zero revenue.  AC ¶¶ 44, 67.  MGT's financial situation was dire by any measure, but its disclosures were comprehensive.  Indeed, plaintiffs do not contest that the full magnitude of the Company's financial problems was disclosed in its public filings.

---

information does not trigger a requirement to disclose other irrelevant information.

26

MGT also disclosed the risk that it could be delisted from the NYSE MKT, as well as the potential negative consequences of delisting.  2015 10-K, p. 10 ("If our Common Stock is delisted from the NYSE MKT LLC, the Company would be subject to the risks relating to penny stocks.").

Having made these disclosures, defendants did not have a further obligation to opine that MGT was not an "operating company" as defined in the NYSE MKT's continued listing requirements.  See In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993) ("[W]hen defendants warn investors of a potential risk, they need not predict the precise manner in which the risks will manifest themselves."); see also In re TVIX Sec. Litig., 25 F. Supp. 3d 444, 457 (S.D.N.Y. 2014) ("Defendants are not required to predict the precise manner in which risks will manifest themselves.") (internal quotation marks omitted).  Companies need not draw negative inferences or characterize their behavior in a pejorative way in order to comply with the securities laws.  See Singh v. Schikan, 106 F. Supp. 3d 439, 448 (S.D.N.Y. 2015) ("[T]he law is clear that companies need not depict facts in a negative or pejorative light or draw negative inferences to have made adequate disclosures."); Harrison v. Rubenstein, No. 02 Civ. 9356 (DAB), 2007 WL 582955, at *13 (S.D.N.Y. Feb. 26, 2007) (holding that a defendant has "no duty to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner in its

public disclosures.") (internal quotation marks omitted); Klamberg v. Roth, 473 F. Supp. 544, 551 (S.D.N.Y. 1979) ("[S]o long as material facts are disclosed or already known, it is not deceptive to fail to 'characterize' those facts with 'pejorative nouns and adjectives,' or to fail to verbalize all adverse inferences expressly."). Once a company discloses "material objective factual matters, it need not characterize or editorialize on those facts in any particular way." Kramer v. Time Warner, Inc., No. 89 Civ. 8234 (LBS), 1990 WL 166665, at *3 (S.D.N.Y. Oct. 24, 1990) (internal quotation marks omitted).

By disclosing the underlying facts about its financial state of affairs, MGT fulfilled its disclosure obligations without further opining as to whether the company would or likely would be delisted by the NYSE MKT. See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014) ("[D]isclosure is not a rite of confession . . . ."); Davidoff v. Farina, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *11 (S.D.N.Y. 2005) (rejecting plaintiffs' argument that defendants failed to disclose that their business plan was "undercapitalized," "given that all of the operative facts . . . were fully disclosed").

Plaintiffs next argue that MGT was not an "operating company" as defined by the NYSE MKT Company Guide, which they characterize as an objective fact that defendants failed to disclose. This argument is misguided. As described above, NYSE MKT's decision to

28

delist or suspend a security under 1003(c) is subjective and wholly discretionary.  See CG § 1002 ("The Rules of the Exchange provides that the Board of Directors may, in its discretion, at any time, and without notice, suspend dealings in, or may remove any security from, listing or unlisted trading privileges.") (emphasis added); CG § 1003 (NYSE MKT will "normally give consideration" to several factors in deciding whether to delist a security) (emphasis added); CG § 1003(c) (NYSE MKT will "normally consider suspending dealings in, or removing from the list, securities of an issuer . . . [i]f the issuer has sold or otherwise disposed of its principal operating assets or has ceased to be an operating company").

Even if the NYSE MKT determined that MGT was not an operating company, the Exchange would consider several other factors in determining whether the Company merited continued listing on the Exchange, including "the degree of investor interest in the company, its prospects for growth, the reputation of its management, the degree of commercial acceptance of its products, and whether its securities have suitable characteristics for auction market trading."  CG § 1001.  In short, it is not an objective fact that a company will be delisted from the NYSE MKT simply because it does not meet the NYSE MKT's definition of "operating company."[11]

---

[11]    The Court is unconvinced by defendants' argument that they did not need to disclose the risk of being delisted under section 1003(c) because the NYSE MKT Company Guide is publicly available.  "Case law does not support the

29

Plaintiffs' other alleged omissions and misrepresentations fare no better.[12]  First, plaintiffs assert that defendants failed to disclose that the D-Vasive and Demonsaw Transactions were unlikely to close.[13]  This argument fails for similar reasons.  MGT disclosed the relevant risks that these transactions would not close; having done so, it had no obligation to opine that the transactions were unlikely to close.

The D-Vasive APA and Demonsaw APA, both of which were disclosed in publicly filed documents, explicitly provide that NYSE MKT approval was a necessary condition for these transactions to close.  D-Vasive APA § 3.2(a)(ii), 5/9/16 8-K, p. 14 ("The respective obligations of each Party . . . shall be subject to . . . the following conditions: . . . Buyer and Seller shall have timely obtained from each Governmental Authority, including

---

sweeping proposition that an issuer of securities is never required to disclose publicly available information," N.J. Carpenters Heath Fund v. Royal Bank of Scotland Grp., PLC, 709 F.3d 109, 127 (2d Cir. 2013), and the "total mix" of information available to reasonable investors does not include the intricacies of the Company Guide's continued listing standards, see id. ("[S]poradic news reports should not be considered part of the total mix of information . . . ."); In re MetLife Demutualization Litig., 156 F. Supp. 2d 254, 268-69 (E.D.N.Y. 2001) (rejecting defendants' argument on a motion to dismiss that they had no obligation to disclose information set forth in the New York Insurance Law).

[12]   At oral argument, plaintiffs stated that they were not abandoning any of the other omissions and misrepresentations alleged in the complaint, but that their "basic theory" was that defendants failed to disclose that they could be delisted under 1003(c) if they were not an operating company.

[13]   Plaintiffs allege that defendants should have disclosed this information in their May 9, 2016 press release, AC ¶ 53, May 26, 2016 press release, AC ¶ 60, May 26, 2016 8-K, AC ¶ 60, June 23, 2016 press release, AC ¶ 84, July 8, 2016 press release, AC ¶ 86, July 11, 2016 press release, AC ¶ 90, July 11, 2016 Preliminary Proxy Statement, AC ¶¶ 73, 88, July 15, 2015 press release, AC ¶ 82, August 8, 2016 press release, and August 15, 2016 press release, AC ¶¶ 73, 88.

NYSE MKT, all approvals, waivers and consents, if any, necessary for consummation of, or in connection with, the Asset Purchase . . . ."); Demonsaw APA § 3.2(a)(ii), 5/26/16 8-K, p. 14 (same text). MGT's summaries of the D-Vasive and Demonsaw Transactions in its filings with the SEC made clear that these transactions had not yet closed and were "contingent on satisfaction or waiver of the closing conditions set therein," and provided that there was "no assurance that the conditions to closing the transactions described herein can be obtained nor that the transaction will be closed."  5/9/16 8-K, p. 3; 5/26/16 8-K, p. 3.   MGT continued to disclose that NYSE MKT approval was necessary to complete the transactions throughout the course of the class period, see 7/11/16 Press Release, p. 3; First Preliminary Proxy Statement, p. 25; Second Preliminary Proxy Statement, p. 26; Definitive Proxy Statement, p. 26, and promptly disclosed that NYSE MKT denied the listing of the shares within 24 hours of its decision, 9/20/16 8-K, p. 3.

Having done so, plaintiffs were not obligated to disclose that the NYSE MKT was "unlikely to list the shares needed to consummate the transaction."  See AC ¶¶ 53(a), 60(a).  MGT had no obligation under the securities laws to make pessimistic predictions about the NYSE MKT's future actions.  See Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain

disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."); Acito v. IMCERA Grp., Inc., 47 F.3d 47, 53 (2d Cir. 1995) (citing Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1976)) ("[L]ack of clairvoyance simply does not constitute securities fraud."). Therefore, when MGT disclosed that adverse regulatory action was possible, it did not have a further obligation to predict that a negative outcome would actually occur. See In re Sina Corp. Sec. Litig., No. 05 Civ. 2154 (NRB), 2006 WL 2742048, at *8 (S.D.N.Y. Sept. 26, 2006) (rejecting plaintiffs' argument that "defendants should have disclosed information because they should have anticipated the actions of the Chinese government"); see also In re Open Joint Stock Co. "Vimpel-Commc'ns Sec. Litig., No. 04 Civ. 9742 (NRB), 2006 WL 647981, at *6 (S.D.N.Y. March 14, 2006).

Second, plaintiffs allege that defendants misrepresented MGT "[a]s a listed company with proper corporate governance and regulatory standards" and as "committed to the highest standards of transparency and corporate governance." AC ¶¶ 60, 84; 5/26/16 8-K, p. 38; 6/23/16 Press Release, p. 2. Plaintiffs assert that these were both misstatements because "[d]efendants were concealing the fact that MGT was in direct non-compliance with NYSE listing regulations, which would cause the NYSE to delist MGT." AC ¶¶ 60, 84. However, statements touting a company's corporate governance and transparency are textbook examples of

inactionable puffery.  City of Pontiac, 752 F.3d at 183 ("It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are 'too general to cause a reasonable investor to rely upon them.'"); In re Braskem S.A. Sec. Litig., 246 F. Supp. 3d 731, 755 (S.D.N.Y. 2017) (defendant's statements about its commitment to "transparency and good corporate governance practices . . . consist of precisely the type of 'puffery' that [the Second] and other circuits have consistently held to be inactionable"); Menaldi v. Och-Ziff Capital Management Group LLC, 164 F. Supp. 3d 568, 580 (S.D.N.Y. 2016) (defendant's statement that "its 'transparency' was a 'competitive strength' and that it actively managed 'reputational risks' . . . constitute[s] inactionable puffery" because it "made no more specific representations or guarantees").

Finally, plaintiffs argue that MGT's actions during the Class Period were likely to cause the NYSE MKT to closely scrutinize MGT, discover that MGT was not in compliance with its listing requirements, and delist MGT.  AC ¶¶ 53, 60, 73, 84, 86, 88, 90, 92.  As discussed above, defendants made comprehensive disclosures about the state of the Company's financial affairs.  Having done so, they were not required to draw negative inferences from the disclosed facts.  See, e.g., City of Pontiac, 752 F.3d at 184; Singh, 106 F. Supp. 3d at 448.  Certainly, defendants were not

33

required to proclaim that the NYSE MKT was <u>likely</u> to delist MGT. Plaintiffs' position that MGT should have presented the D-Vasive and Demonsaw transactions to the Exchange while stating publicly that these actions would likely result in the Company's delisting is untenable.   Defendants were entitled to advocate on the Company's behalf with the NYSE MKT.   Plaintiffs' preferred course of action would hardly have benefitted the shareholders; stating that the Company would likely be delisted would have been a <u>fait accompli</u>.[14]

### 2.   Section 20(a)

The plaintiffs also allege that the individual defendants, Mr. Ladd and Mr. McAfee, are liable under Section 20(a) of the Exchange Act because they acted as "controlling persons" of MGT who participated in MGT's alleged securities fraud.   AC ¶¶ 138-43.   Section 20(a) provides for joint and several liability for "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."   15 U.S.C. §

---

[14]     Since we find that plaintiffs failed to allege actionable misstatements or omissions by any of the defendants, we do not reach defendants' additional argument that the 10(b) claims against Mr. McAfee are precluded by the Supreme Court's holding in <u>Janus Capital Grp. v. First Deriv. Traders</u>, 564 U.S. 135, 142 (2011), because Mr. McAfee was not "the person or entity with ultimate authority over the statement[s], including [their] content and whether and how to communicate [them]."

78t(a).   To establish a prima facie case of control person liability, a plaintiff must show a primary violation by the controlled person.  ATSI Commc'ns, 493 F.3d at 108.   Because plaintiffs have failed to plead a primary violation by MGT, their Section 20(a) claims also fail.  See Slayton v. Am. Express Co., 604 F.3d 758, 778 (2d Cir. 2010).[15]

### IV.   CONCLUSION

For the foregoing reasons, we grant defendants' motion to dismiss in its entirety.  Because any further leave to amend would be futile, the dismissal is granted with prejudice.  The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 39, enter judgment for defendants, and close this case.


Dated:      New York, New York
            February **27**, 2018

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[15]   We therefore do not reach defendants' alternative ground for dismissing the 20(a) claims against Mr. McAfee because he did not become an officer of MGT until November 18, 2016, nearly a month after the end of the Class Period.  AC ¶¶ 1, 16; see Schlifke v. Seafirst Corp., 866 F.2d 935, 949 (7th Cir. 1989) ("[S]ection 20(a) requires control at the time of the alleged violation; activities and events that occur later cannot support a claim of liability.").  But see Menaldi, 164 F. Supp. 3d at 587 ("As a general rule, determining an individual defendant's liability as a control person is a fact-intensive inquiry that . . . should not be resolved on a motion to dismiss."); DANIEL J. KRAMER, AUDRA J. SOLOWAY, ET AL., FEDERAL SECURITIES LITIGATION § 10-2 (2d ed. 2012) (finding that "a wide variety of different control relationships have resulted in a controlling person found liable," not limited to a company's current corporate officers).